## Ewart's Estate.

*Wills—Devisavit vel non—Undue influence—Meretricious relations with testator—Insufficient evidence.*

A petition for an issue devisavit vel non alleging that the principal beneficiary under the will had exercised undue influence over the testator, is properly refused where it appears that the testator, a man thirty-four years of age, disinherited his mother, who had no estate of her own, and devised his entire estate to his aunt; that testator was periodically an excessive drinker, and at one time when in that condition was confined in the county jail with the knowledge and consent of his mother; that his estate was all inherited from his father who was divorced from his mother; that he had not lived with his mother for two years prior to his death, but during that time had resided with his paternal grandmother, with whom his aunt, the beneficiary, and her husband also lived; that testator when sober was strong in intellect and will power; that the beneficiary was not present when the will was written or signed and took no part in its preparation, but later on the day of its execution testator handed the will sealed in an envelope to her and she kept it until his death; that there was nothing to indicate that testator could not have executed another will subsequently had he desired to do so; and contestant's claim that meretricious relations had existed between testator and his aunt was insufficiently sustained.

Argued Oct. 16, 1914. Appeal, No. 165, Oct. T., 1914, from decree of O. C. Allegheny Co., Nov. T., 1913, No. 214, refusing issue devisavit vel non in Estate of John

McC. Ewart, deceased.  Before BROWN, POTTER, ELKIN, STEWART and MOSCHZISKER, JJ.  Affirmed.

Appeal from decree of register of wills admitting to probate will of John McC. Ewart, deceased.

Petition for issue devisavit vel non.

TRIMBLE, J., filed the following opinion:

This is a petition for an issue devisavit vel non.

John McClurg Ewart was born July 16, 1878, made his will on October 17, 1910, and died on May 28th, 1912, a little less than thirty-four years of age.  By his will he disinherited his mother, who has no estate of her own, and devised and bequeathed his entire estate to his aunt Flo Winnett Ewart, the wife of his father's brother, in the following language:

"I bequeath all my property real and personal, whatsoever to Mrs. Flo Winnett Ewart—I am not making this will because it has been said that the said party has an undue influence over me, but for love and esteem.

My property consists of an interest in residence, an interest in a widow's annuity in the State of Pennsylvania, a banking account in Pennsylvania, and a banking account in the State of Kansas.

I do hereby make, constitute and appoint John McClurg Hays, to be executor of this my last will and testament."

A caveat was filed by his mother, but when a time was fixed for hearing, the caveator did not appear, and on September 14, 1912, the will was probated.

The petition for appeal was filed by the mother, who was then represented by different counsel, and in it she alleges that her son was of unsound mind, and did not have testamentary capacity; and further that he was the victim of undue influence exercised over him by his aunt, the sole beneficiary.

At the opening of the case, counsel for the contestant said:

"It is admitted by counsel that the will of John Mc-Clurg Ewart, deceased, was duly probated,"
and at the close of the testimony he said:

"I did not mean we would offer no evidence which would show testamentary incapacity; much less did I mean to say that the testator was capable. What I meant was to admit in advance that the testimony we had to offer might not be sufficient, and for the purposes of this case might be assumed to be insufficient, to make a case of testamentary incapacity. I did not mean of course it should not be considered, so far as it is offered in connection with evidence of undue influence, and for the purpose of establishing that ground."

The undue influence exerted on the testator is alleged to have culminated in the execution of the will, because of meretricious relations with his aunt, and the weakened intellect and will power, which was the result of the excessive use of alcoholic stimulants. It is admitted that the testator was periodically an excessive drinker of alcoholic stimulants, which induced his premature death. This habit was well formed in 1898, and the uncontradicted testimony shows that about that time, while living with his mother at their residence in Lawrence, Kansas, he had delirium tremens. When he was in that condition he was confined by a physician, with the knowledge and consent of his mother, in the county jail in that place for a short time, not exceeding one day and one night. He was then taken to Boulder, Colorado, by a lawyer, where he was a patient in a sanitarium for a time; then he returned to Kansas, and with his mother went to Citronelle, Alabama.

His estate, which amounted to about $30,000, was all inherited from his father, who was divorced from his mother.

While in Alabama, he received some telegrams from his counsel in Pittsburgh about his business affairs, and in response to these left his mother, came to Pittsburgh in the year 1908, and lived here continuously until his

death. He never lived with his mother again. He had a common school education, read much, and at one time was a ranchman, but had no occupation after 1908.

His paternal grandmother lived here, and he went to her home and resided with her. This household was composed of the grandmother, his uncle S. F. Ewart and his wife, the chief beneficiary, and their servants. His aunt was about four years older than he.

Prior to 1908, his uncle, aunt and he had taken several summer trips, one of which was on horseback from his mother's home in Kansas to the Yellowstone National Park, in 1900; another was to Bedford Springs, Pa. When in Lawrence, Kansas, getting ready for the Yellowstone trip, the party lived at the Ewart homestead, and while there a colored domestic said, that the testator and his aunt when up stairs about ten or eleven o'clock in the morning and occupied the testator's room for a short time with the door locked. The aunt and her husband both denied this most positively, and in answer thereto said that the testator was not at the house any morning, but was away in the city purchasing supplies and equipment for the horseback trip. Following this excursion Mrs. Ewart, the testator's aunt, wrote to him at least eight letters, the first being November 15, 1900, and the last on January 24, 1907, which indicate more than platonic love.

There is not another word in the case to indicate any meretricious relations, or any improper conduct on the part of the aunt, except the contradicted statement of a caretaker at the Ewart homestead in Pittsburgh, who said that Mrs. Ewart's husband had told him "that his wife had made a damn fool of herself with Jack (meaning the testator), but that anybody would have done that for thirty thousand dollars." The times when his statement is alleged to have been made are fixed at about a month after the testator's death, and again on February 3d, of this year.

The opportunity for meretricious relations was pres-

ent almost all the time from 1908 until a short time after the execution of the will; but excepting the period when the will was written, both before, at the time and after, because the testator was under the care of a nurse, who was with him day and night, having slept with him on the same bed, and who said he saw nothing improper between the parties. All of the witnesses who were called to testify, said that there was nothing unseemly about their actions in the house or elsewhere.

During the year 1910, prior to the execution of the will, the reliable evidence shows that the testator's mother employed counsel in Pittsburgh to have the testator restrained from squandering his estate, notwithstanding the testimony of the mother to the contrary. Counsel was persistent in pursuing him, and finally after frequent efforts to confer with him, by keeping himself incognito, and representing to the testator's aunt that he desired to see her about a real estate transaction, she went to his office, and while there was told by counsel that she had more influence over the testator than anybody else, and was threatened that if she did not use this influence to have her nephew turn over to his mother a part of his money, he would have a guardian appointed for him and cause her to be the central figure of a scandal. This was communicated to the testator by the aunt, and in our judgment shows the reason for the use of his language in the will, when he says, "I am not making this will because it has been said that said party (meaning his aunt) has an undue influence over me, but for love and esteem."

Before the will was written he told an old friend of his father that he and his mother were not friends, because she had put him in jail; that he would not leave her any of his property, and that if Mrs. Ewart, his aunt, would not take it, he would will it to charitable institutions.

When the testator's mother came to Pittsburgh, after the will was written, he would not see her until she had

told him that she had not employed counsel to have a guardian appointed for his estate; that this statement of hers was false is beyond any doubt. He declared that he had bought his mother a home which she sold, and then got mad at him because he would not buy her another.

There is not a word, nor an act which shows that the testator's aunt ever influenced him in anything. He always managed his own business affairs, and when he loaned money to his aunt, he secured it by mortgage or note. There is not a suspicion that he did not manage his property well, or that his dissipation extended beyond his drinking.

When he was sober, he was strong in intellect and will power. The evidence on this point is abundant, and it is established as a fact beyond question. There is not only no evidence that he was under the influence of liquor when he executed his will; but all of the evidence points clearly to the fact that he was entirely sober at this time. His nurse and his physician were mature and intelligent men, and disinterested in the outcome of this proceeding. The testator had been sick, but had recovered sufficiently to be able to walk about the room, and was sitting up in his chair when he executed the will. The scrivener was his nurse, but the will was written in the presence of the physician, and signed in the presence of both, who testified that he was mentally capable of making his will at that time, and their testimony is uncontradicted.

The beneficiary was not present when the will was written or signed, and took no part in its preparation; but on the day it was signed, the testator handed it to his aunt, sealed up in an envelope, and she kept it until his death, when she gave it to her counsel, who opened it for the first time.

After he executed his will, early in the year 1911, he left his grandmother's house and never lived there again, but lived at other places in the City of Pittsburgh, until

his death, which occurred more than one year thereafter. From the time the will was executed until his death, which was about one year and five months, there is not a word in the case which would indicate that he could not have executed another will, by which he could have bequeathed his property to any person whom he may have desired to receive it. The opportunity was always present, and there is no evidence at all of any influence, good or bad, exerted over him by any person, nor can there be any inference of it founded on fact.

When a contestant expects to obtain an issue on the ground of undue influence, he must show more than a meretricious relation, and a will which appears to be unnatural.

Dean v. Negley, 41 Pa. 312, was reversed to admit a rejected offer of evidence, to prove, among other things, that the testator and his paramour, a married woman, were having meretricious relations, "at the time of the making of the will," and that the mother of the beneficiary dominated his acts before and after the will was made. Snyder v. Erwin, 229 Pa. 644, was sustained when it appeared that adulterous commerce had existed between the testator, then seventy-five years old, and his paramour, a designing grandmother, several years before the will was executed, at the time of the making of it, and its continuance thereafter, and, that the proponent received the entire estate to the exclusion of a daughter, against whom there was no other grievance, than that she had declined to receive her father's paramour to her home.

In each of these cases testator had become enfeebled in health, and resided at his beneficiary's home until death, and whether each was of unsound mind was a question at issue. We conclude from these two cases that where there is an unnatural will, and there is evidence of mental decay, or some restraint upon, or domination of the testator at the time of the execution of the will and thereafter, coupled with a meretricious relation,

positively proven to have occurred before the execution
of the will, at the time of its execution, and afterwards,
there is a question of fact for a jury. But where there is
no mental decay, or restraint, or domination, and the
man is master of himself, as in Allshouse v. Kelly, 219
Pa. 652, the presumption of undue influence will not
spring from proof of meretricious relation, and an un-
natural will, even though the whole estate is willed to
his paramour, and his progeny left to their own re-
sources.

John McClurg Ewart was sober and master of himself
when he executed his will, and was under no restraint
from any person at that time, or thereafter, until his
death.

A testator is not bound to furnish a reason, satisfac-
tory to others, for what he has done, or is doing with his
own: Caughey v. Bridenbaugh, 208 Pa. 414. A will
cannot be said to be unnatural only because the mother,
or son, or daughter is disinherited, and if a presumption
arises from the disinheritance of the mother, it is re-
buttable. But it "is unnatural in a legal sense only when
it is contrary to what the testator from his new views,
feelings and intentions would have been expected to
make. When it is in accordance with such views, it is
never unnatural, however much it may differ from the
ordinary actions of men in similar circumstances": Mor-
gan's Estate, 219 Pa. 355.

The reason for disinheriting his mother, which the
testator was not bound to furnish, appears in the testi-
mony. His mother was not a Rizpah. She wanted his
money, and threatened restraint, which would deprive
him of his estate, and was untruthful to him in her
declarations about this matter. She had divorced his
father, who had left all he had to him. He had bought
her a home, which she sold, and she consented to his
confinement in jail. He refused to write to her, and
had become estranged from her, and let it be known, at
least to his nurse and his father's friend and his aunt.

He told others that he would give his estate to his aunt, because she had' been kind to him. The will is in harmony with the testator's known feelings, and intentions, and even though it differs from the ordinary actions of men, it is not unnatural.

"In many instances testamentary dispositions of property seems harsh, if not unjust, the result, perhaps, of prejudice as to some of testator's kindred, or undue partiality as to others. But these are matters about which we have no concern. The law wisely secures equality of distribution where a man dies intestate. But the very object of a will is to produce inequality, and to provide for the wants of the testator's family; to protect those who are helpless; to reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human nature. It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them; he may be unjust to his children or relatives; he is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania, without sufficient evidence, nor upon any sentimental notions of equality," Cauffman v. Long, 82 Pa. 72.

If the testator was of sound and disposing mind and memory when he made his will, and was not acting under an illegal restraint, then this will, in law, must stand, although it may offend the sense of propriety and justice of every man in the land; his prejudices, likes and dislikes, acquired by his associates in life, were his own as much as the property of which he made distribution. Phillips' Estate, 244 Pa. 35.

In the last case cited, it is said "that undue influence is a control acquired over another which virtually destroys his free agency," and in the absence of direct proof of undue influence actually exercised by the proponent, or a presumption thereof, arising against him from something in the evidence indicating weakness or infirmity in the testator, his testimony, when taken with the other proofs in the case, may so far discharge the burden of explaining away any circumstances introduced by the contestant's witnesses, which apparently require explanation, as to justify binding instructions in favor of the will or the refusal of an issue.

We searched the records in this case in vain for any testimony measuring up to this requirement. The only suggestion of unsoundness of mind is in the drunkenness of the testator; but unless this was his condition when the will was executed, it is no proof of mental unsoundness: Tasker's Est., 205 Pa. 455; McCauley's Est., 224 Pa. 1.

It is nothing but a guess to say that the beneficiary of this estate influenced the testator. Direct proof of fraud is absent, and "When the effort is to establish undue influence without direct proof upon the point, it cannot be made out by circumstances which, though to be expected if there was fraud, are equally consistent with its absence, and such circumstances cannot, whether taken singly or collectively, justify an inference of wrong doing." Phillips' Est., 244 Pa. 35, quoted from Caughey v. Bridenbaugh, 208 Pa. 414.

A petition was presented for rehearing in this case; but there was no testimony offered which the petitioner could not have submitted to the court at the hearing, that is material to the issue, and upon a careful examination of all the facts alleged in the petition, and the affidavits attached thereto, we are of the opinion that if all of the evidence were admitted, it would not change the result of this case.

The court dismissed the petition.    Margaret McC. Ewart appealed.

*Error assigned,* among others, was the decree of the court.

*Arthur O. Fording,* with him *Clarence Burleigh* and *E. F. Caldwell,* for appellant.

*John C. Bane,* with him *Charles A. Woods,* for appellee.

PER CURIAM, October 26, 1914:

On this appeal from the refusal of an issue devisavit vel non, we concur in the legal conclusion of the court below that the appellant failed to show why it should have been awarded.

Appeal dismissed with costs.