BLAKE *v.* SIMPSON, ADMINISTRATOR.

4-8657                                                    215 S. W. 2d 287

Opinion delivered December 6, 1948.

264

*Richard W. Hobbs* and *David B. Whittington,* for appellant.

*Ernest Maner,* for appellee.

WINE, J.   October 16, 1946, George Sims, then a resident of Hot Springs, Garland county, Arkansas, executed his last will and testament, which was filed for probate in said county April 28, 1947.   After providing for the payment of testator's just debts and funeral expenses, the will further provided:  ''All the rest, residue and remainder of my estate, real, personal and mixed, of which I may die seized and possessed, or to which I shall be entitled at the time of my death, either at law or in equity, and wheresoever situated, I give, devise and be-

queath unto my good friend, Beatrice Bishop, Route One, Ponta, Texas, absolutely and in fee simple.''

It is not shown that this beneficiary was related to the testator either by affinity or consanguinity.

June 9, 1947, the appellants filed their petition in the Probate Court of Garland county, alleging: ''The deceased, George Sims, left neither issue, wife, father, nor mother, and that plaintiff's (appellants) herein are the sole and only living heirs of the deceased . . . that the said writing is not the last will and testament of the said George Sims; that the said George Sims, at the date of the writing, was not of sound and disposing mind and memory, but by reason of extreme age and sickness and being in such extreme condition of mental and physical weakness that he was incapable of making or undertaking to make a will of testamentary distribution of his property . . . That at the time of the signing of the purported will the decedent signed the same under restraint, undue influence and fraudulent representations and statements on the part of the defendant, Beatrice Bishop, and that thereby, and not otherwise, the said George Sims was induced to execute the said pretended will''; and praying '' . . . that the said pretended last will and testament of George Sims, and the probate thereof aforesaid, be set aside . . . ''

Upon a hearing of this cause the Probate Court entered its order dismissing appellant's complaint, declaring the said Beatrice Bishop to be the beneficiary under the will, and finding that the testator did possess testamentary capacity to make and execute the will, from which said order appellants bring this appeal.

The following stipulation was entered into: ''It is hereby stipulated and agreed between counsel for contestants and contestees that the purported last will of George Sims, deceased, was executed in accordance with law and was admitted to probate in common form; that the purported last will of George Sims, deceased, was duly attested and witnessed by Leland Leatherman and Eugene Matthews and Betty A. Burrough, and that they

signed the same in the presence of the testator and in the presence of each other . . . It is further agreed and stipulated between counsel for contestants and counsel for contestees, that the relationship of the deceased, George Sims, as alleged in the complaint filed by the contestants in this case, is true, and that the same relations in fact exist.''

The testator, George Sims, was a former resident of Chicago, being a retired street railway employee who came to Hot Springs some 12 years prior to his death. There is conflict in the record as to his date of birth and, therefore, his resulting age at the time of the execution of his will. Mrs. Estella Blake, a resident of Chicago, testified that testator was her half brother and was 89 years of age. Reading from what she represented to be her father's Bible, she testified: ''George Sims was born July 2, 1857.''

Whereas, Appellee R. H. Simpson, executor, introduced a certified copy of an entry of birth given at the General Register Office, Somerset House, London, England, showing the date of birth as September 25, 1864. This document was said by Appellee Simpson to have been found among the testator's personal effects after his death.

Appellant William Lawrence Blake, son of testator's half sister, Estella Blake, testified that his relationship with testator was always amicable; when he graduated from high school testator took him to Marshall Field & Company to seek employment for him; he entered the military service in the spring of 1942; while he sent Christmas cards to his uncle, his uncle did not write to him and that the last Christmas card sent to testator was in 1946.

Appellant Mrs. Estella Blake testified that when testator lived in Chicago, he visited her home and the home of another sister; he was always present with other members of the family during the holiday season and took part in the festivities, but that she had not seen him since 1942. These were the only appellants who testified, nei-

ther of whom produced any letter or other communication from their deceased relative, and other witnesses called by appellants testified that they had never heard the deceased refer to any of his relatives with the exception of two brothers. However, one witness, James F. Spohn, called by appellant, did testify that the testator once exhibited to him a postal card said by testator to have been received from William Lawrence Blake and the testator then expressed a desire to reply, but did not have the address of the sender who was then in military service. Other witnesses for appellants testified that they had heard the testator make reference to other members of the family and indicate that he was a member of a large family.

Other testimony was adduced on behalf of appellants from residents of Hot Springs and former associates of the testator, but none of these witnesses, seven in number, was willing to say that the testator lacked testamentary capacity, either at the time of the execution of his will or at the time of his death; the net result of all their testimony being that the testator was forgetful, illustrated by his misplacing keys; on at least one occasion failing to recognize an acquaintance on the street; dropping off to sleep while listening to radio programs; leaving his hat or coat in public eating places; that his mind was sometimes a little slow.

One such witness, Ralph Walters, who had known the testator for 18 years, and with whom the testator lived for 12 years, was named executor in the will, but who, through lack of experience, declined to serve. He testified that he had heard the testator speak of his two brothers, but never heard him mention his sisters. This witness further testified: "His (testator's) mind was a little slow. It seemed like it kind of wandered, but I wouldn't say anything was wrong with his mind."

At the conclusion of the lay testimony offered by appellants, a hypothetical question based on a *resume* of all the appellants' testimony was propounded to Dr. Elizabeth D. Fletcher, a practicing psychiatrist with six years' private practice in the field of psychiatry: "What

would be your opinion as to that person's (testator's) mental capacity and his mental condition at the time of making the will?" Dr. Fletcher answered: "From the description as given, I would say this man (testator) was suffering from a psychosis or mental condition due to hardening of the arteries or arterio-schlerosis, mostly colored with senility."

On cross-examination Dr. Fletcher was asked: "If a man was eighty-three years of age instead of eighty-nine, and if he managed his business affairs properly, and if he had considerable sums invested in various stocks and bonds and owned some property, and if he looked after it all wisely, gave thought to it, would you say as a psychiatrist that that indicates to you that he was capable of looking after his own affairs?" Dr. Fletcher answered in the affirmative.

Various witnesses called by appellee testified in virtual conflict to the lay witnesses called by appellants; the net result of their testimony being that the testator was unusually alert physically and mentally for a man of his age. Dr. L. M. Redding, M. D., a practicing physician, Marshall, Texas, a graduate of Texas University and Baylor Medical College, with interneship at Parkland Hospital, Dallas, Texas, who had for 16 years engaged in the practice of his profession, testified by interrogatory: "March 8, 1947, I gave George Sims a general physical examination, including blood pressure, urinalysis, heart, chest, abdominal, etc." Question: "What were your findings? Answer: "Patient complained of occasional abdominal distention and indigestion and at these times some swimming in the head. Otherwise said he felt fine. His blood pressure was 174/88. His heart was functioning normally. His chest and abdomen were negative. His urine was normal." Question: "Was the patient's mental condition good?" Answer: "Normal." Question: "In your professional opinion was George Sims (on the date of your examination) of sound mind, competent judgment, capable of reaching his own decisions?" Answer: "Yes, I believe Mr. Sims was of sound mind at the time of his examination because he gave a

perfectly rational description of his symptoms, he cooperated perfectly during the examination . . . I observed during the course of our conversation and examination that Mr. Sims' mind was quite clear and that his coördinations were good, for a man of his age. Otherwise, the examination was primarily physical. He spoke very coherently of things we used to treat him for."

In addition to the testimony of Dr. Redding, Mr. Eugene A. Matthews, a capable and respected member of the Garland County Bar, who drafted the will, testified that he had one other contact with testator prior to the occasion on which the will in contest was drawn, the purpose of the first visit being to inquire of Mr. Matthews whether or not a change in the residence from the State of Illinois to the State of Arkansas would have any effect upon a will which had been executed in the State of Illinois.

Mr. Matthews further testified that at the time of testator's second visit to his office, he was accompanied by Beatrice Bishop, the beneficiary. After some general discussion as to the provisions to be contained in the will and in the presence of one of the other attesting witnesses, the beneficiary, Beatrice Bishop, was asked to leave the room. Mr. Matthews related: "We then discussed with Mr. Sims whether or not he knew the extent of his property and knew what he was doing in the execution of his will, and he stated that he did. And insofar as we were able to tell, he had capacity to make a will.

"I didn't notice any change in his physical condition from what it had been on the occasion when I had first talked to him. He was a man, of course, of advanced years, but I thought in very good condition for his age. I saw no signs either of physical impairment or mental impairment that would affect his ability to make a will."

In the recent case of *Shippen* v. *Shippen*, 213 Ark. 517, 211 S. W. 2d 433, this Court said: "We have often defined mental capacity such as must be possessed by a testator in order for him to make a valid will. The rule has been generally expressed that sound mind and disposing memory, constituting testamentary

capacity, is (a) the ability on the part of the testator to retain in memory without prompting the extent and condition of property to be disposed of; (b) to comprehend to whom he is giving it; and (c) to realize the deserts and relations to him of those whom he excludes from his will. *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405; *Boone* v. *Boone,* 114 Ark. 69, 169 S. W. 779; *Mason* v. *Bowen,* 122 Ark. 407, 183 S. W. 973, Ann. Cas. 1917D, 713; *Griffin* v. *Union Trust Company,* 166 Ark. 347, 266 S. W. 289; *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695; *Petree* v. *Petree,* 211 Ark. 654, 201 S. W. 2d 1009. And the burden of proof, in cases of this kind, is on the contestant, who asserts the mental incapacity of the testator. *McWilliams* v. *Neill,* 202 Ark. 1087, 155 S. W. 2d 344; *Parette* v. *Ivey,* 209 Ark. 364, 190 S. W. 2d 441."

On the question of whether old age will invalidate the will of the testator in the case of *Griffin* v. *Union Trust Company,* 166 Ark. 347, 266 S. W. 289, this Court said: "Old age, physical incapacity and partial eclipse of the mind will not invalidate a will, if the testator has sufficient capacity to remember the extent and condition of his property without prompting, to comprehend to whom he is giving it, and be capable of appreciating the deserts and relation to him of others whom he excluded from participating in his estate. He is not required to do all those things, but should have capacity to do them."

In the case of *Pernot* v. *King,* 194 Ark. 896, 110 S. W. 2d 539, this Court quoted with favor Thompson on Wills, § 62, pp. 88-89: "Mere age is not necessarily inconsistent with testamentary capacity. 'Indeed, the mental faculties may be weakened and impaired by old age without destroying such capacity. The mere fact that an aged testator's memory is failing, or that his judgment is vacillating, or that he is becoming eccentric, or that his mind is not as active as formerly—these things do not invalidate his will if it was fairly made and he was free from undue influence. While age is not of itself a disqualification, yet it excites vigilance to see if it is accompanied with capacity."

In *Puryear* v. *Puryear,* 192 Ark. 692, 94 S. W. 2d 695, hereinabove cited, this Court said: ''The contents of the will, the manner in which it was written and executed, the nature and extent of the testator's estate, his family and connections, their condition and relative situation to him, the terms upon which he stood with them, may be inquired into in determining the testator's capacity . . . Neither feebleness of intellect nor physical suffering is sufficient to render a will void unless so great as to render the testator unable to appreciate the consequences of his acts.''

The record in this case is wholly silent as to what, if any restraint or undue influence beneficiary Beatrice Bishop exercised over the testator or what fraudulent representations and statements were made by her to the testator although appellants, in their brief, urge that her accompanying testator to the office of Mr. Matthews is evidence of such or should be so considered. To this, we do not agree.

According to the testimony, testator had once lived with the family of Beatrice Bishop and they had been friends for many years. The rule on this contention is likewise well settled. In the Puryear case, *supra,* this Court quoted with favor from the case of *Lavenue* v. *Lewis,* 185 Ark. 159, 42 S. W. 2d 649: ''The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion, or any other cause deprives the testator of his free agency in the disposition of his property. And the influence must be specifically directed toward the object of procuring a will in favor of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life or that he was surrounded by them and in confidenial relation with them at the time of its execution.''

And finally, appellants urge that testator's will was an unnatural disposition of his property. The principle is well established that it is not within the province of courts and juries to make wills for persons by decrees and verdicts rendered in will cases. Testamentary power

inheres alone in the testator. Subject to restrictions and limitations fixed by statute, or by recognized rules of law and public policy, an owner may dispose of his property by will as he pleases. Within certain limits "he is permitted to project his individuality, his grasp and his desires, beyond the grave, and make them effective through his last will and testament." The fact that his will is unjust, unnatural, or unreasonable does not affect its validity. No relative or next of kin, no matter how near they may be, or how deserving of the testator's bounty, has any legal or natural right to the estate which can be asserted against the legally executed will of the testator. Thompson on Wills, Second Ed., § 18, p. 31.

In the case of *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405, this Court said: "Every man has the untrammeled right to dispose of his property by will as he pleases, with only such limitations as the statutes may impose. The 'English Law,' said Lord Chief Justice COCKBURN, 'leaves everything to the unfettered discretion of the testator on the assumption that, though in some instances caprice or passion, or the power of new ties, may lead to the neglect of claims that ought to be attended to, yet the instincts, affections and common sentiments of mankind may be safely trusted to secure, on the whole, a better disposition of the property of the dead, and one more accurately adjusted to the requirements of each particular case, than could be obtained through a disposition prescribed by the steryotyped and inflexible rule of general law' . . . jealousy, anger, hate, or resentment, however violent and *unnatural* will not defeat a will unless the emanation of a delusion."

When these rules are applied to the testimony adduced in this case, it may be held that appellants did not sufficiently discharge the burden imposed upon them, nor can it be held that the will was executed through fear, coercion or under any other malign influence which would stamp it as not the testator's own act.

The preponderance of the evidence amply supports the findings and orders of the Probate Court and the judgment is affirmed.