TOOMBS *v.* BLANKENSHIP.

4-8892                                221 S. W. 2d 417

Opinion delivered June 20, 1949.

*Kirsch & Cathey* and *Phil Herget,* for appellant.

*L. V. Rhine, Bon McCourtney* and *Claude B. Brinton,* for appellee.

MINOR W. MILLWEE, J. T. A. Blankenship was a resident of Greene County, Arkansas, at the time of his death on June 10, 1948, at the age of 65. He left surviving him three children as his sole heirs at law. They are C. W. Blankenship, a son, and Floice Blankenship

Toombs, a daughter, who are the appellants here, and a son, Loice Blankenship, the appellee. At the time of his death, decedent owned his farm which was worth approximately $12,000 and personal property of the value of approximately $8,000.

On June 16, 1948, appellee applied for an order admitting to probate an instrument dated February 14, 1948, purporting to be the last will of his father. On the same date there was filed the affidavits of the two attesting witnesses to the will. Under the terms of the will decedent devised and bequeathed all his property to appellee who was also appointed executor to serve without bond. The will mentions appellants and provides that they shall receive nothing "for the reason that they are already amply provided for and I feel I have done my part by each of them". Appellants filed their protest and objections to probate of the will on the grounds of lack of mental capacity and undue influence. After a three day hearing at which some 550 pages of testimony were taken, the trial court entered an order finding that decedent had testamentary capacity and was not subjected to undue influence at the time of the execution of the will, which was ordered admitted to probate.

The principal contention for reversal of the judgment is that the trial court's finding as to testamentary capacity and undue influence is against the preponderance of the evidence. We shall not attempt a detailed discussion of the highly conflicting evidence on these issues. A majority of the witnesses are relatives of the parties and their testimony is in hopeless conflict as to the extent and nature of decedent's physical and mental condition before and after the execution of the will on February 14, 1948. This testimony is characteristic of the extravagance of statement, bias and partisanship that often result when brother is arrayed against brother in legal combat.

T. A. Blankenship resided in Missouri where he engaged in farming for many years prior to 1947. Early in 1947, he sold his farm and moved to one that he purchased in Greene County, Arkansas. Each of the appel-

lants lived with their father on the Missouri farm until about 1932 when they both married and moved to homes of their own. After appellee married he remained with his father and moved to the Arkansas farm with his wife and seven children in 1947. Although appellee was lame from childhood, he was not disabled and assisted his father in farming operations, taking whatever the latter chose to pay him for his services until 1948 when he received the customary one-third and one-fourth crop rent. Neither decedent nor his children ever attended school. Appellant, C. W. Blankenship owned his 114-acre farm at the time of his father's death. Appellant, Floice Toombs, and her husband were not so successful at farming and decedent made a loan of $1,000 to them in May, 1947, under an agreement that the Toombs would sell their place and repay the loan. Mrs. Toombs testified that they had a crop failure in 1948 and were unable to make payment.

In February, 1947, decedent suffered what his physician, Dr. R. J. Haley, designated a mild stroke. Dr. Haley treated decedent at intervals from the time of his first illness until his death. He testified that decedent was suffering from arteriosclerosis, high blood pressure, and, at times, a kidney condition; that while his illness affected him mentally, his condition never became psychopathic or reached the stage where confinement in an institution was necessary; that decedent's mind would come and go and he experienced lucid intervals when his "mental qualities" appeared normal from February, 1947, until the date of his death. In response to a hypothetical question based on facts testified to by witnesses for appellants, Dr. Haley stated that decedent would not, in his opinion, have been mentally capable of executing a will on February 14, 1948. In answer to a similar question based on a state of facts as related by witnesses for appellee, he stated that decedent would have had sufficient mental capacity to execute the will in question. Decedent consulted Dr. Haley at his office on the day the will was executed, but the doctor would not undertake to say what his mental condition was at that time.

The testimony on behalf of appellees discloses that on the morning of February 14, 1948, decedent got the deed to his farm from his daughter-in-law and came to Paragould with appellee and some of his children. The children went to a show and decedent and appellee went to the courthouse where decedent paid his taxes and procured a poll tax receipt. Decedent and appellee then separated and decedent went to his bank and cashed a check for $50 and made a visit to the office of Dr. Haley. He also went alone to the office of his attorney where he remained for some time and executed his will between 2:00 p. m. and 3:00 p. m. The will was witnessed by the attorney and Lester J. Johnson. Decedent explained to his attorney that appellant, C. W. Blankenship, was "pretty well fixed" and did not need help; that he had given or made a loan of $1,000 to Mrs. Toombs and that she was fixed so she could take care of herself; that appellee had stayed with him and had received nothing for his labors, but a bare living, and decedent felt that everything he had was due to appellee's efforts. After the will was dictated to the stenographer, it was read back to decedent and he stated that that was the way he wanted it. Decedent furnished his deed for land descriptions written in the will. Although he spoke distinctly, he misspelled the names of his children. The will was left with the attorney and placed in the office safe.

Mrs. Joe Bynum, a teller at the Security Bank, testified that decedent usually came to her window and during the last several months of his life had witness to sign and witness his mark to checks. She stated that decedent was able to transact banking business without assistance from others who might accompany him; that he made his own deposits without making mistakes; and that he cashed a check for $50 on the date of the execution of the will. It was her opinion that decedent had sufficient mental capacity to make a will at that time.

E. R. Browning, cashier of the bank, testified that he had known decedent since the early thirties and visited with him when he transacted business at the bank, and that he noticed no change in decedent's mental condition

during the time he knew him. Decedent changed his bank account to a joint account with appellee sometime between April, 1947, and March, 1948.

There was other evidence that decedent suffered from failing eyesight, was forgetful, and would at times become lost. Most of the instances of loss of memory occurred after the execution of the will in question. There was also evidence that decedent became seriously ill on the evening of February 14, 1948, following his trip to Paragould.

In the recent case of Blake v. Simpson, 214 Ark. 263, 215 S. W. 2d 287, we reaffirmed the rule stated in Griffin v. Union Trust Co., 166 Ark. 347, 266 S. W. 289, as follows: "Old age, physical incapacity, and partial eclipse of the mind will not invalidate a will, if the testator has sufficient capacity to remember the extent and condition of his property without prompting, to comprehend to whom he is giving it, and be capable of appreciating the deserts and relations to him of others whom he excluded from participating in his estate. He is not required to do all those things, but should have capacity to do them."

We further said in the Blake case: "The principle is well established that it is not within the province of courts and juries to make wills for persons by decrees and verdicts rendered in will cases. Testamentary power inheres alone in the testator. Subject to restrictions and limitations fixed by statute, or by recognized rules of law and public policy, an owner may dispose of his property by will as he pleases. Within certain limits 'he is permitted to project his individuality, his grasp and his desires, beyond the grave, and make them effective through his last Will and Testament'. The fact that his will is unjust, unnatural, or unreasonable does not affect its validity. No relative or next of kin, no matter how near they may be, or how deserving of the testator's bounty, has any legal or natural right to the estate which can be asserted against the legally executed will of the testator. Thompson on Wills, Second Edition, § 18, p. 31." See, also, Puryear v. Puryear, 192 Ark. 692, 94

S. W. 2d 695; Pernot v. King, 194 Ark. 896, 110 S. W. 2d 539; Shippen v. Shippen, 213 Ark. 517, 211 S. W. 2d 433; Scott v. Dodson et al., 214 Ark. 1, 214 S. W. 2d 357.

We have also repeatedly held that the questions of testamentary capacity and undue influence are so interwoven in any case that the court necessarily considers them together. In Phillips v. Jones, 179 Ark. 877, 18 S. W. 2d 352, the court said: "Where the mind of the testator is strong and alert the facts constituting the undue influence would be required to be far stronger in their tendency to influence the mind unduly than in another, where the mind of the testator was impaired, either by some inherent defect or by the consequences of disease or advancing age. It is clear that feeble intellect will not be of itself sufficient to establish lack of testamentary capacity, for that condition must be so great as to render the testator incapable of appreciating the nature and consequences of his act; but this feebleness may be inferred when, from the facts in proof, it is apparent that he was incapable of appreciating the deserts and relations of those whom he excludes from participating in his estate, although he might have had the ability to retain in memory, without prompting, the extent and condition of his property, and to comprehend to whom he was giving it." It was also held in Brown v. Emerson, 205 Ark. 735, 170 S. W. 2d 1019, that, where a testator's disposition of his property is unaccountably unnatural, less evidence is required to establish undue influence.

On the question of undue influence we have many times reaffirmed the following statement of the court in McCulloch v. Campbell, 49 Ark. 367, 5 S. W. 590: "As we understand the rule, the fraud or undue influence, which is required to avoid a will, must be directly connected with its execution. The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property. And the influence must be specially directed toward the object of procuring a will in favor

of particular parties. It is not sufficient that the testator was influenced by the beneficiaries in the ordinary affairs of life, or that he was surrounded by them and in confidential relations with them at the time of its execution.''

This is not a case where the testator has designated a remote kinsman or acquaintance outside the family circle as beneficiary to the exclusion of his own flesh and blood. While it may appear that decedent's act in disinheriting two of his children was unjust and unnatural in the circumstances here, neither the probate court nor this court is authorized to strike down the will and to make what we might consider a more equitable disposition of decedent's property unless the greater weight of the evidence shows that he did not have the mental capacity to realize the respective deserts and relationship of his children or that the disposition he chose to make was induced by undue influence. There is a paucity of evidence of undue influence. While decedent was on good terms with all of his children, there was doubtless a strong bond of affection and attachment between decedent and the son and grandchildren with whom he spent his last years. It is undisputed that appellee was a loyal and dutiful son whose industry and efforts contributed in a large measure to the accumulation of the estate left by his father. This close relationship may have influenced decedent in making his will, but the evidence is insufficient to show that it was corruptly exercised and exerted for that purpose. The issue of mental capacity presents a closer question and the testimony is in hopeless conflict. The trial court saw and heard the witnesses and we cannot say that his finding on the whole case is against the preponderance of the evidence.

Appellants also contend that error was committed in the court's refusal to permit the introduction of a written statement made by Dr. Haley to counsel for appellants prior to the trial. The writing contained some hearsay statements and it is not clear from the record for what purpose it was offered. The doctor was present and gave his testimony and counsel for appel-

lants declined to say that the written statement was offered for the purpose of impeaching him as a witness. The writing might have been admissible for this purpose since it stated that decedent was not, in the doctor's opinion, capable of understanding ordinary business transactions during the last six months of his life. Doctor Haley had previously testified that he would not undertake to say whether decedent was mentally capable of executing a will on Feb. 14, 1948. We find no error in excluding the written statement.

We agree with appellants' contention that Dr. Haley should have been permitted to give his opinion, based on his own personal knowledge, as to decedent's mental capacity. Since he had treated decedent for over a year he was qualified to give his opinion based on either hypothetical facts as an expert or facts within his own knowledge, or both. 20 Am. Jur., Evidence, § 793. Again it is not clear from the record that the court refused to permit Dr. Haley to state his opinion from his personal knowledge. The court first sustained appellee's objection to the testimony on the ground that it was merely a repetition of previous testimony given by the doctor. After an extended colloquy, the court changed his ruling and overruled appellee's objection. Instead of restating the question or asking for an answer, counsel for appellant again offered the written statement with Dr. Haley still on the witness stand. Even if we treat the court's rejection of the written statement as a refusal to permit Dr. Haley to give an opinion based on personal knowledge, we still conclude that the judgment of the trial court is not against the preponderance of the evidence.

Affirmed.