C. W. ABEL *v.* CARL DICKINSON, EXECUTOR ET AL

5-5559                                                467 S. W. 2d 154

Opinion delivered May 10, 1971
[Rehearing denied June 14, 1971.]

*Basil H. Munn,* for appellant.

*John M. Graves,* for appellees.

JOHN A. FOGLEMAN, Justice. This case involves the contest of the will of Grace Abel Evans by her 74-year-

old brother C. W. Abel. Mrs. Evans died in the Ouachita County Hospital on April 12, 1969, when she was 81 years of age. She was a widow without any children and survived only by appellant with whom she had lived for many years. Abel had never been married. Mrs. Evans had successfully operated cafes and boarding houses. Because of a heart attack, high blood pressure and failing eyesight, she retired from the operation of a coffee shop in Chidester three years before her death. She was not able to operate her automobile. She and her brother lived on a farm about 1½ miles from Chidester for over 15 years. Abel had farmed the lands for over 20 years. This land was conveyed to Mrs. Evans by her mother, shortly before the latter's death. Mrs. Evans employed Mrs. Belton Stinnett, who was not a relative, to drive her automobile for her, and to mow and keep her downtown lots and other yards, and care for her flowers. She paid Mrs. Stinnett $1 per hour for her services.

The will was not probated or its existence disclosed to appellant until after Mrs. Stinnett's death in an automobile collision one month after Mrs. Evans' death although he testified that Mrs. Stinnett frequently came out to the house, where he and his sister had lived, after Mrs. Evans' death and that she borrowed his sister's car (which she was using at the time of her death) from him on several occasions. After Mrs. Evans' death Mrs. Stinnett's son disclosed that the will was in his mother's purse. Later the will was delivered by Henderson Stinnett, the widower of Mrs. Belton Stinnett, to Carl Dickinson, the executor nominated therein. Dickinson caused a copy of the will to be made, which he delivered to appellant. Later he took the original to its scrivener, Mr. Thomas Gaughan, an attorney at Camden, who offered it for probate.

The will directed payment of Mrs. Evans' debts, devised a life estate in a 40-acre tract and a 2-acre tract of land to appellant, with remainder to Charles Franklin Stinnett, one of the sons of Mrs. Stinnett, and devised lots in Chidester to Mrs. Stinnett. Carl Dickerson [Dickinson] was nominated as executor. No mention

was made of personalty and the will contained no residuary clause, although Mrs. Evans owned her automobile, an interest in her mother's furniture and other personal property. Mrs. Evans had no close relatives, other than her brother. Neither Mrs. Stinnett nor her son was related to Mrs. Evans by blood or marriage.

The probate judge found that the evidence was insufficient to show that Mrs. Evans was incompetent to make a will at the time of its execution, that a preponderance of the evidence showed that she was of sound and disposing mind and memory and fully competent to dispose of her property and estate by last will and testament, and that she was not acting under the influence of Mrs. Belton Stinnett or any person whatsoever in the making or publication of the will.

Appellant's first point for reversal is that the court failed to exclude the lots in Chidester from the will. He contends that his sister did not own the lots since he was the owner of an undivided one-half interest as a tenant in common, as the only heir of his mother beside Mrs. Evans. The lawyer who drafted the will explained that he failed to note that the ownership of this property indicated on the tax receipts given him to identify Mrs. Evans' property was listed in the names of both Mr. Abel and Mrs. Evans. Resort to tax receipts and deeds of a testator to determine what he meant by a land description he employed is proper. *Eagle* v. *Oldham*, 116 Ark. 565, 174 S. W. 1176. Appellees conceded that this one-half interest was never owned by Mrs. Evans and has never been claimed as a part of her estate. They also concede in their brief here that the will devises only the undivided one-half interest of Grace Abel Evans. If there was any error in this regard, it is harmless, because appellees could not hereafter require appellant to elect whether he will retain his own property and repudiate his sister's will or conform to the will and permit Stinnett to keep the full title to the lots, as otherwise might be the case under such decisions as *McDonald* v. *Shaw*, 92 Ark. 15, 121 S. W. 935, 28 L.R.A. (n.s.) 657.

Appellant next contends that the will is so unreasonable[1] as to overcome the presumption of testamentary capacity and so unnatural as to give rise to an inference that it resulted either from lack of testamentary capacity or undue influence. The fact that a will is unjust, unreasonable or unnatural does not affect its validity. *Blake* v. *Simpson,* 214 Ark. 263, 215 S. W. 2d 287. No relative, however near or however deserving of a testator's bounty he may be, has any claim which can be asserted against a legally executed will. *Blake* v. *Simpson,* supra. One possessed of testamentary capacity, acting free from inducement by fraud or undue influence, may make testamentary dispositions of his property to whomever he chooses, no matter how capricious or frivolous they may seem to others. *Hiler* v. *Cude,* 248 Ark. 1065, 455 S. W. 2d 891. It is not necessary that the objects of a testator's bounty be meritorious in order for a will to be valid. It is only essential that it be the free and voluntary act of a mind having testamentary capacity. *Jones* v. *Jones,* 234 Ark. 163, 350 S. W. 2d 673.

We have held, however, that the courts may consider that the provisions of a will are unjust, unnatural and unreasonable as a circumstance in determining the mental capacity of the testator. See *Brown* v. *Emerson,* 205 Ark. 735, 170 S. W. 2d 1019. This does not mean that this circumstance alone overcomes the natural presumption of sanity or testamentary capacity or creates any presumption of lack of testamentary capacity or of the existence of undue influence. The disposition made by a testator may give rise to an inference of mental illness or undue influence, but not to any presumption. See *Scott* v. *Dodson,* 214 Ark. 1, 214 S. W. 2d 357; cf. *Alford* v. *Johnson,* 103 Ark. 236, 146 S. W. 516. Evidence of an unjust, unreasonable and unnatural disposition is admissible only as a help to be considered with other evidence, as tending to show an unbalanced mind or one easily susceptible to undue influence. *Howell* v. *Miller,* 173 Ark. 527, 292 S. W. 1005. A court cannot strike down a will in favor of what it deems to be a more equitable disposition of the testator's property, unless it appears from the evidence that

it was induced by undue influence or that the testator lacked testamentary capacity. *Toombs* v. *Blankenship,* 215 Ark. 551, 221 S. W. 2d 417.

We are unable to say that a preponderance of the evidence shows that the disposition made by Mrs. Evans by her will was unjust, unnatural or unreasonable. It is only where a testamentary disposition is unaccountably unnatural that less evidence is required to establish undue influence. *Dunklin* v. *Black,* 224 Ark. 528, 275 S. W. 2d 447.

This is not a case where a parent attempted to disinherit her only child in favor of her youngest brother, a successful 40-year-old businessman of independent means, as was the case in *Brown* v. *Emerson,* supra, or a case where the testatrix disinherited a sister for whom she had great affection and who had given her part of their mother's estate to the testatrix by favoring a male business associate with whom she had become infatuated as was the case in *Howell* v. *Miller,* supra. It is unexplained inequality and unreasonableness which do violence to natural instincts of the heart, to the dictates of affection, to natural justice, to solemn promises and moral duty that are entitled to weight in considering questions of testamentary capacity and undue influence. *Brown* v. *Emerson,* supra. If a disposition can be rationally explained, it cannot be said to be unnatural. *In re Llewellyn's Estate,* 83 Cal. App. 2d 534, 189 P. 2d 822 (1948); *In re Walther's Estate,* 177 Ore. 382, 163 P. 2d 285 (1945). See *Scott* v. *Dodson,* 214 Ark. 1, 214 S. W. 2d 357; *Dunklin* v. *Black,* 224 Ark. 528, 275 S. W. 2d 447. The expression "unjust and unnatural will" is usually applied when a testator leaves his estate, or a large portion of it, to strangers, to the exclusion of natural objects of his bounty without any apparent reason. *In re Shay's Estate,* 196 Cal. 355, 237 P. 1079 (1925). See *Scott* v. *Dodson,* supra. A will cannot be said to be unnatural because a testator preferred one for whom she had developed a close and affectionate relationship [*In re Walther's Estate,* supra; see *Scott* v. *Dodson,* supra; see also *In re Ewart's Estate,* 246 Pa. 579, 92 A. 708 (1914)], or when the

natural objects of the testator's bounty are in no need of funds, aid or assistance. *In re Llewellyn's Estate,* supra. A will is unnatural in the legal sense only when it is contrary to what the testator would have been expected to make in the light of his feelings and intentions at the time, even though they may be prejudiced, however much it may differ from the ordinary actions of people in similar circumstances. *In re Ewart's Estate,* supra.

Facts which mitigate against a finding that Mrs. Evans' will was unjust, unnatural or unreasonable are appellant's advanced age, his and the testatrix's childlessness, the absence of any other close relatives, the provision for a life estate for Abel, his inheritance of any personal property of his sister remaining after payment of debts and expenses of administration, his succession to three joint bank accounts (once amounting to at least $22,000) established by the testatrix, and the relationship that had developed between Mrs. Evans and Mrs. Stinnett. Among Mrs. Evans' personal belongings was a collection of antiques and of her own works of art, some of which were shown to have some value. She also owned some stocks, which Abel said had been "cashed out" after her death. Not only does it clearly appear that Mrs. Stinnett performed well the services for which she was employed by Mrs. Evans, it is also obvious that these two ladies shared a warm affection for each other. Abel himself testified that Mrs. Stinnett "loved his siter to death," "petted her all the time," and would sit down and talk and "gossip" with her nearly every day of the week during Mrs. Evans' entire three years' illness. Abel said that Mrs. Stinnett visited his sister on occasions when she was "not on the payroll." Charles Franklin Stinnett, her son, was a pallbearer at Mrs. Evans' funeral. He testified that he visited Mrs. Evans about once a month during the two or three years preceding her death. He said that she had loaned him money and given him advice about saving money. Etheleen Garrison, Ouachita County Health Nurse, observed that Mrs. Evans became more and more dependent on others. The nurse rarely met any social visitors when she made at least semi-

monthly professional calls on Mrs. Evans. We cannot say that Abel was in need of his sister's bounty or that Mrs. Evans' bounty to Mrs. Stinnett and her son is not rationally explained or that it is unaccountably unnatural.

Giving the disposition made by Mrs. Evans its strongest probative force, however, we still could not say that the chancellor's findings are clearly against the preponderance of the evidence.

For proof of lack of testamentary capacity, appellant relies upon Mrs. Evans' age, her being an invalid for two or three years and her loss of memory which he claimed to have resulted from a stroke about one month before the will was made, in addition to the alleged unnatural disposition of her real property. He depends for the most part on his own testimony, particularly as to the alleged stroke. He concluded that an illness suffered by his sister was a stroke because when she awakened him about 1:00 a.m. she was lying in the bed with her eyes open and in such condition that he knew something was badly wrong, causing him to get help to get an ambulance to take her to a hospital where she remained for two weeks. His conclusion was contradicted by the testimony of a supervising nurse at the hospital where Mrs. Evans was a patient. This witness, called by appellant, testified that there was no diagnosis of a stroke prior to Mrs. Evans' death, that she did not see anything like that on the patient's chart, and did not observe any personality change in the testatrix after a time at least one month prior to the alleged stroke.

Dr. J. L. Dedman was Mrs. Evans' physician for about five years, beginning July 7, 1964. He attributed her death to heart failure. For four or five years she was in his office every month or so. She was under his care in the hospital approximately a dozen times. Before her death, she was coming to the doctor's office every three or four weeks. Each of her visits was for a period of five to ten minutes. He described her mental condition as "sharp as a tack." He identified a nota-

tion on her will dated April 18, 1968, that Mrs. Grace Evans was mentally able to take care of her business as having been written and signed by him. Although he said that Mrs. Evans was getting worse and weaker all the time, and was "going downhill" after February 1968, he saw her thereafter on March 12, and found no difference in her mental condition. He attributed her hospital visits to the necessity for draining fluid that accumulated in her system because of a heart weakened by high blood pressure and hardening of the arteries. He stated that Mrs. Evans did not have a stroke during his treatment of her. He stated that he knew nothing of her mental ability to know the nature and extent of her property or the just deserts of her different kinsmen.

Mr. Thomas Gaughan, a practicing attorney at Camden since 1934, was the scrivener. The will was dated February 26, 1968, and prepared in his office to which Mrs. Evans and Mrs. Stinnett came on that date. He testified that Mrs. Evans asked him to prepare her will, and told him the disposition she wanted to make of her property. He had not known either Mrs. Evans or Mrs. Stinnett prior to this occasion. He observed that the testatrix was approaching 80 years of age. He discussed the matter with the two ladies, who remained in the room while he dictated the will to his secretary. He said that Mrs. Evans looked at the will before signing it. According to him, Mrs. Evans was in his office 1½ to 2 hours. He testified that he evaluated Mrs. Evans as having testamentary capacity, or he would not have prepared the will. His consultation revealed nothing to him abnormal or subnormal, except for her advancing years, and he was of the opinion that she knew her property.

The burden of showing lack of testamentary capacity lay upon appellant. *Hilter* v. *Cude,* 248 Ark. 1065, 455 S. W. 2d 891. We are unable to say that evidence adduced by appellant preponderates over the testimony of the physician and the attorney, whose respective actions strongly corroborate their testimony. For the most

part, it consisted of: Abel's testimony that Mrs. Evans was unable to see without her glasses, that she had the mind of a 10-year-old child after her "stroke" that she did not recognize people and that she was forgetful; the testimony of Juanita Norwood that for the last two years Mrs. Evans was failing with regard to her mental state, and had poor memory; and the testimony of Etheleen Garrison, Ouachita County Health Nurse as to Mrs. Evans' gradual decline after February 1968, her deteriorating mental condition from 1967 until her death, her increased dependency on others, her inability at times to complete a statement or remember what she was talking about, her forgetfullness, and her discarding of two checks received in the mail about a year prior to her death. Complete sanity in a medical sense was not essential to testamentary capacity, if the power to think rationally existed when the will was made. *Hiler* v. *Cude,* supra. Awareness of her relatives, of the property owned and of the disposition made of it is the critical factor. See *Rogers* v. *Crisp,* 241 Ark. 68, 406 S. W. 2d 329. It was not shown to be lacking.

This leaves the question whether the preponderance of the evidence shows that Mrs. Evans' will was induced by the undue influence of Mrs. Belton Stinnett. While the burden of proof on this issue was upon appellant, he seeks to shift it, just as the appellants did in *Hiler* v. *Cude,* supra, and *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 665. He relies upon the rule that where the will is drawn or procured by a beneficiary, there is a presumption of undue influence, making it incumbent upon the proponents of the will to show beyond reasonable doubt that the testator had both the requisite mental capacity and freedom of will and action to render the will legally valid. See *Orr* v. *Love,* 225 Ark. 505, 283 S. W. 2d 667. This rule, however, does not shift the burden of proof, in the sense of ultimate risk of nonpersuasion, from the contestant, although it may shift the burden of going forward with the evidence. *Hiler* v. *Cude,* supra. Of course, there are two essential elements necessary to establish undue influence. First, the influence must not be that which springs from natural affection or is acquired from kind offices, but

must be such as results from fear, coercion, or other cause that deprives the testator of his free agency in the disposition of his property. Second, it must be directly connected with the execution of the will and specially directed toward the object of procuring a will in favor of particular parties. *Thiel, Spec. Admr.* v. *Mobley,* 223 Ark. 167, 265 S. W. 2d 507. The presence of Mrs. Stinnett in the attorney's office was not sufficient to shift the burden of proof, if the will was drafted according to explicit directions of Mrs. Evans, given without prompting or instructions by Mrs. Stinnett. *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S. W. 2d 665.

Appellant relies upon the fact that one of the principal beneficiaries of the will, who was the mother of the other, drove Mrs. Evans' automobile to the office of the scrivener, helped her into the office, and engaged in discussions about the terms of the will. There was, as appellant admits, no element of fear or duress involved. Furthermore, there is no actual proof that Mrs. Stinnett procured the will or directed its making. The mere fact that a beneficiary is present when the will is made does not give rise to any presumption of undue influence when there is no evidence that he induced or procured the execution of the will. *Jones* v. *National Bank of Commerce,* 220 Ark. 665, 249 S. W. 2d 105. Appellant testified that the undue influence Mrs. Stinnett exercised consisted of petting his sister to death and running out all the time and getting every dollar she could out of her. He only suspected that Mrs. Stinnett "carried the ball' while some unidentified person gave her plenty of help. Of course, the testimony of the scrivener is of vital importance. Certainly a practitioner of his long experience would be particularly alert to any attempt on the part of Mrs. Stinnett to dictate or direct the terms of the will. He could not recall any particular comment she made while the three were discussing the will. He said that it did not appear to him that Mrs. Evans was under duress, compulsion or restraint or in fear. His testimony as to directions given by Mrs. Evans and her insistence on paying for his services immediately tends to negate any undue in-

fluence on her. He testified that after Mrs. Evans directed that the will provide for a remainder in the 42 acres of land in Charles Franklin Stinnett, either she or Mrs. Stinnett or both explained to Gaughan that Mr. Abel was unmarried and without descendants and that the testatrix had no children. This fact is not indicative that Mrs. Stinnett was directing the action or procuring the particular testamentary disposition. After the will was typed, Mr. Gaughan read it to both ladies, before he handed it to Mrs. Evans. He testified that Mrs. Evans was not told what to do or given any commands while in his office. Appellant sought to discredit the testimony of this lawyer by showing alleged inconsistent statements made to a friend of appellant. These statements were denied by Mr. Gaughan. We cannot say that the probate judge erred in according greater credibility to the scrivener's testimony. Neither can we say that Mrs. Stinnett was the procurer of the will nor that the probate judge's finding on undue influence is against the preponderance of the evidence.