FRANCIS MAXINE THOMPSON *v.* ESTATE OF GEORGE
W. ORR, DECEASED

5-5862                                         479 S.W. 2d 229

Opinion delivered April 24, 1972

*Cambiano & Cree,* for appellant.

*Haley, Young, Bogard, & Gitchell,* for appellee.

LYLE BROWN, Justice. This is an appeal from the
allowance of the probate of the last will and testament of
George W. Orr. The single point for reversal is that the
will was executed through mistake, incompetency, and
undue influence.

Mr. Orr executed a will dated February 8, 1968. In that will he named as beneficiaries his "beloved friend," Ruth L. Aday, and Frances Maxine Thompson, the testator's daughter. With the exception of a small amount of stock in an oar company, the legatees were to share the estate equally. We shall refer to it as the first will. One week later Mr. Orr executed another will, dated February 15. We shall refer to it as the second will. Ruth L. Aday was named to serve as executrix without bond. Mr. Orr's estate was estimated as being worth $50,000. In the second will the testator bequeathed savings bonds with a face value of $2,750 to his daughter and the balance of the estate to Mrs. Aday.

Mrs. Aday's first petition for probate referred to the will of February 15 (second will) but she actually filed, through inadvertence, the first will of February 8. When the error was discovered the court permitted her to file the second will and proceed thereunder. Mrs. Thompson took no exception to the first will; her attack was made on the second will. After considerable testimony the attack on the second will was rejected, the court finding that testator had the mental capacity to execute the same and that it was executed free of undue influence. We hold that the findings of the probate court are not against the preponderance of the evidence.

Mrs. Aday, a widow, and Mr. Orr, a widower, resided in North Little Rock. An association between them began some twenty-three years ago and lasted except for a brief interlude of one month, until his death in January 1970. They were constant companions and the undisputed evidence is that they had great affection for each other. They lived as close neighbors. He would eat one or two meals most every day with Mrs. Aday and would spend most every evening with her. Each had a married daughter, one living in Oklahoma City, and the other in Memphis. The couple made many trips to those cities on visits. The families of the two daughters were very devoted to the unmarried couple. It is uncertain why Mrs. Aday and Mr. Orr did not marry. Mr. Orr retired from the railroad but kept somewhat active in business affairs. He owned some grazing land, some stock in an oar factory at Conway, and

he invested in first mortgages through Block Realty Company.

In 1965 Mr. Orr suffered a stroke which partially incapacitated him physically. It appears that at that time Mrs. Aday began assisting him in business matters. In early 1968 he suffered another stroke and rented a room at Mrs. Aday's home so she could look after him. There he remained until his death.

Six witnesses testified in behalf of appellant, Mr. Orr's only child. The competent testimony by which appellant sought to establish undue influence, incompetency and mistake, is scant. Appellant testified that as a result of the first stroke her father's ability to write and to walk was affected; that her father gave Mrs. Aday power of attorney; that after the stroke Mr. Orr's mind "would slip, come and go"; that he would repeat a sentence over and over and would not seem to know what he was doing; that this was in 1965. that she knew of no logical reason why her father would leave the bulk of his estate to Mrs. Aday. It was her conclusion that Mrs. Aday had considerable control over her father and used undue influence.

Clell Stobaugh testified for appellant. He said he visited Mr. Orr in 1968 when he had a light stroke. During that visit he noted that at times Mr. Orr's mind would be clear but at times "it would not seem to be all right." Martha Ann Evans, Mr. Orr's granddaughter, said it was her conclusion. from talking with her grandfather after his second stroke, that he was not capable of making a will. "He would call me by my mother's name and would call my daughter by my name. . .I cannot tell you why I thought he was incompetent, but in talking to him it was all sorts of little things." Witness Bessie Linscott was a close friend of Mrs. Aday and Mr. Orr. She related that after the first stroke Mrs. Aday looked after Mr. Orr's business affairs. She could not say that Mrs. Aday ever attempted to influence Mr. Orr in the making of a will; however, she testified that on one occasion Mrs. Aday related to the witness that Mr. Orr had made a will and had divided his estate equally between his daughter, granddaughter, and Mrs. Aday. Witness Maudie Thompson said

she knew Mr. Orr was in bad physical condition in early 1968 following his second stroke. Witness M. H. Mullins testified that he declined to witness the February 15 will because he thought that Mr. Orr was incompetent and under pressure from Mrs. Aday.

Eight witnesses testified on behalf of appellee. Witness Roy Carmack is Mrs. Aday's son-in-law. He related a visit with Mr. Orr in March 1968, a few weeks after the wills were executed. He described Mr. Orr as having a slight impairment of his left side but said he was mobile. He said there was no impairment of speech. He described Mr. Orr as being mentally alert and entirely coherent. Mrs. Carmack testified that in the summer of 1968 she took Mr. Orr to Hot Springs on a vacation. She described his mental condition as excellent. Witness Carroll Holland rented an apartment from Mrs. Aday for seven years. He was aware of Mr. Orr's two strokes and said during those periods he visited with Mr. Orr quite often. It was his conclusion that Mr. Orr was in control of his mental facilities. Witness Sam Block testified that he visited with Mr. Orr after his last stroke and obtained his signature on a release deed. "He seemed to talk intelligently. I did not notice anything abnormal about Mr. Orr's mind." Witness Ray Stell is employed at the oar factory in Conway in which Mr. Orr owned an interest. He said Mr. Orr visited the plant in the summer of 1968. "At this time there was nothing to lead me to believe that Mr. Orr was not in complete control of his mental faculties." R. D. Andrews, Jr., was one of the witnesses to the will. Mr. Orr was walking with the aid of a crutch. To him, Mr. Orr appeared mentally normal "and knew what he was doing." (The other witness to the will is deceased.) Witness James Foster of the Foster Oar Company visited Mr. Orr after his 1968 stroke. He said he found Mr. Orr to be mentally alert.

Witness Byron Bogard, who drafted both wills testified for appellee. He explained Mr. Orr's reason for executing the second will. Mr. Orr said that subsequent to the execution of the first will he discovered that the total value of all bonds which he owned and which were in the names of Mr. Orr and his daughter had a value of

around $10,000. It was for that reason, according to Mr. Bogard, that Mr. Orr wanted to "realign" his will. (As best we can tell from the record the value of the recited bonds totalled only $4,000.) Mr. Bogard stated that "in my opinion Mr. Orr was competent to execute a will and did so of his own free will." Finally, Mr. Bogard related that he never discussed the contents of the will with Mrs. Aday.

The general rule is that the burden of proving mental incompetency, undue influence, or fraud which will defeat a will is on the party contesting it. *Sullivant* v. *Sullivant,* 236 Ark. 95, 364 S.W. 2d 665 (1963). We also pointed out in *Sullivant* that undue influence is not the kind of influence "which springs from natural affection, or is acquired by kind offices, but it is such as results from fear, coercion, or any other cause that deprives the testator of his free agency in the disposition of his property." Under the evidence in the case at bar the probate court was warranted in finding that the bequest to Mrs. Aday did not develop from that sinister influence described in *Sullivant* as constituting undue influence; to the contrary it is just as likely to have resulted from some twenty-three years of happy companionship and devotion to each other. We can easily understand why an only daughter, devoted as she was to her father, is unable to comprehend the reasonableness of her taking a secondary role to that of Mrs. Aday. But as we said in *Taylor* v. *McClintock,* 87 Ark. 243, 112 S.W. 405 (1908): "Testators are not required by law to mete out equal and exact justice to all expectant relations in the disposition of their estates by will, and the motives of partiality, affection, or resentment, by which they naturally may be influenced, are not subject to examination and review by the courts." To the same effect see *Abel* v. *Dickinson,* 250 Ark. 648, 467 S.W. 2d 154 (1971).

Finally, appellant contends that Mr. Orr relied on the mistaken belief that the sum total of his savings certificates amounted to some $10,000; and that the second will should be cancelled because of that mistaken belief. "The general rule is that a will is valid even though made by reason of a mistake of fact." 1 Bowe-Parker; Page on

Wills, § 13.11. The authors then state the principal reason for the rule: "To inquire into what testator would have wished to do if he had known the material facts, and to determine just to what extent his will is affected by the mistake is a task of intolerable difficulty. No one probably ever made a will with absolute and perfect knowledge of every fact which might affect his disposition by will; and to determine the exact effect of each mistake is a task upon which no court could enter."

This court has twice refused to modify a will where the testator was allegedly mistaken in the law. *Taylor* v. *McClintock, supra,* and *Hollingsworth* v. *Hollingsworth,* 240 Ark. 582, 401 S.W. 2d 555 (1966).

Affirmed.