Jones v. National Bank of Commerce.

4-9612            249 S. W. 2d 105

Opinion delivered June 2, 1952.

666

*Wils Davis, Earl P. Davis, Charles L. Neely* and *Cecil Nance,* for appellant.

*Frank J. Glankler, John S. Montedonico, James C. Hale* and *John A. Fogleman,* for appellee.

MINOR W. MILLWEE, Justice. This is a proceeding by appellant, Mary Carruth Jones, to contest the will of her father, L. B. Carruth, who died August 19, 1949, at the age of seventy-six years.

At the time of his death the testator owned about 3,000 acres of farm lands in Crittenden County, Arkansas,

valued at approximately $200,000 and about $155,000 in cash, bonds and other securities. Under the terms of the will executed on February 3, 1948, the residue of the estate after payment of debts and taxes was placed in trust and testator's wife, Ostella Carruth, was named executrix and trustee with unlimited power and authority to handle the trust estate. It was also directed that the annual net income from the operation of the trust during the wife's lifetime should be distributed 70% to her and 30% to appellant.

The will then provides: "After the death of my wife, Ostella Carruth, the entire net income from the Trust Estate will be distributed annually to my daughter, Mary Carruth Jones, subject only to the special bequest in favor of Simon Carpenter. And after the death of my daughter, Mary Carruth Jones, the net income will be distributed annually as follows: 1/3 to my brother, Albert Carruth, if then living; 1/3 to my wife's sister, Mrs. Lelia Hamilton, if then living, otherwise to her son, Thomas Hamilton, if then living; and 1/3 to Frank G. Barton, if then living, otherwise to his legal heirs, in accordance with the laws of descent and distribution then in effect in the State of Arkansas; in the event Albert Carruth dies prior to the vesting of the bequest in his favor, or during the life of the Trust, the devise to him will lapse, and the net income will be distributed equally between Mrs. Lelia Hamilton, if living, or if she is dead, to her son, Thomas Hamilton, if living, and to Frank G. Barton, or to his legal heirs, as above provided; subject only to the special bequest in favor of Simon Carpenter, or in the event, Mrs. Lelia Hamilton, and her son, Thomas Hamilton, should die before the bequest to them is vested, or during the life of the Trust, the net income will be divided equally between Albert Carruth and Frank G. Barton, or to his legal heirs, as above provided. . . .

"If the necessities of my daughter in any year should be more than her income from the Trust, then, in that event, the Trustee (Trustees), if convinced of her necessity, may only with the approval of the Chancery

Court of Crittenden County make such additional advances, even though the advance may have to come from the *corpus* of the Trust estate.

"On the termination of the Trust herein created, or at my death, should my wife, Ostella Carruth, my daughter, Mary Carruth Jones, my brother, Albert Carruth, my wife's sister, Mrs. Lelia Hamilton, and her son, Thomas Hamilton, predecease me, I give, devise and bequeath unto my good friend, Frank G. Barton, the entire *corpus* of the Trust Estate, in fee simple, or if no Trust Estate intervenes, all of my property, real, personal and mixed, wherever situated, in fee simple to Frank G. Barton. If Frank G. Barton be not living at the date the devise to him would vest, then in that event, the devise to him will not lapse, but will descend and pass to his heirs in accordance with the law of descent and distribution then in effect in the State of Arkansas, in fee simple.

"For many years Frank G. Barton has been my close friend and advisor and has aided me materially to accumulate what property I now own, not only financially, but in many other ways and it is partly on this account and partly on account of my friendship and high regard that I hold for him that I am directing that he share in my estate as herein provided."

It was further provided that if testator's wife should resign as trustee on account of her health or should die before the testator, then title to the trust estate should vest in appellees, National Bank of Commerce of Memphis, Tennessee, and Frank G. Barton, as trustees with the same powers and authority as granted to the wife as original trustee.

Paragraph 2 of the will reads: "I have already purchased and paid for two separate houses for my daughter, Mary Carruth Jones, one of which she now occupies and the other she rents, and the title to both is now held by her, and in addition thereto, I have given her various sums of money for her maintenance and support since she reached her majority."

The special bequest to Simon Carpenter, testator's faithful negro chauffeur, was the rent from a specified forty-acre tract on the condition that Carpenter remain in the continuous employment of testator's wife during her lifetime.

Mrs. Ostella Carruth was in good health when the will was executed, but became disabled in July, 1948, from a paralytic stroke which destroyed her power of speech. Shortly after testator's death, she tendered her written resignation as trustee and appellees were appointed trustees in succession by the Crittenden Chancery Court as provided in the will. The will was admitted to probate by order of the Crittenden Probate Court August 26, 1949.

On February 18, 1950, appellant filed her petition to contest the will on the grounds that the testator was of unsound mind and without testamentary capacity on February 3, 1948, and that appellee, Frank G. Barton, had over a period of years exercised undue influence over the testator to execute the will. Separate answers were filed by Frank G. Barton and the appellees jointly which generally and specifically denied the allegations of the petition. After an extended hearing in which nearly 100 witnesses testified and 3,000 pages of testimony and exhibits were introduced, the trial court rendered judgment upholding the will and dismissing appellant's petition. The primary issue on this appeal is whether the judgment is contrary to the preponderance of the evidence as appellant earnestly contends.

Testator was born and spent his early boyhood near Tupelo, Mississippi. He moved to Crittenden County, Arkansas, when he was a young man and began farming near Crawfordsville, Arkansas. A. P. Carruth, his brother, assisted him in his farming operations at different times from 1901 to 1910. Testator married a young lady of Crittenden County who died soon after their marriage. Shortly thereafter he married Ostella Rowan, a boyhood sweetheart, with whom he lived until his death. The appellant is their only child.

Testator first rented and then started acquiring farm lands which he operated successfully from the beginning. In 1912 he had what his brother and the appellant called a nervous breakdown, but what a physician who assisted in treating him testified was pellagra. He rented out the lands he had then acquired and with his wife and the appellant, who was then about seven or eight years old, moved back to Mississippi for treatment of his malady by his relatives, Dr. L. O. Carruth and son, Dr. Roy Carruth. Testator recovered from his illness and returned to Crittenden County after an absence of about two years. He continued to accumulate more farm lands and his early farming operations were financed through the J. T. Fargason Co., a Memphis cotton firm. When this firm encountered financial difficulties and became unable to render the type of financial assistance required by the testator, he obtained a connection with the F. G. Barton Cotton Co. in 1928. He continued to do business with that firm until his death.

Appellee, Frank G. Barton, who was vice-president of the cotton company in 1928, and the testator became and remained close friends and associates until the latter's death. Through the years testator borrowed from the firm to purchase lands, to furnish his farming operations and those of his tenants and lessees, and to discharge other indebtedness including the purchase of a home in Memphis for appellant and the payment of a loan on a life insurance policy. He sold all his cotton through the company and made the firm his business headquarters. He used the office help in negotiating contracts, leases, mortgages, and other instruments negotiated with tenants and lessees. He frequently consulted with appellee Barton in reference to contemplated trades, cotton market quotations, and his farming operations generally. Both the testator and his wife used the firm very much as a bank, drawing drafts on it to pay various expenses including personal bills. Testator was charged the same interest and commissions for the firm's services as other customers.

Testator was successful in his farming operations which he actively pursued. He moved to Memphis,

Tennessee, which is only a few miles from his Crittenden County lands, for a time about 1915 and then moved back to Crittenden County. At his wife's insistence he purchased a comfortable home known as "Red Acres" in Memphis in 1938 taking title in his wife's name. He rented most of the lands that year to another Crittenden County planter, but resumed the active management of the farms upon the latter's untimely death the same year.

Testator continued to farm portions of his plantation and to rent or lease various tracts until 1944 or 1945 when he began to rent or lease all of it to several tenants and lessees. Thereafter he remained active in the operation of a ginning company and in negotiating contracts and mortgages with his tenants most of whom he continued to furnish. Until his wife was stricken in July, 1948, he maintained living quarters in residences on his farm in Arkansas where he usually spent most of the week and returned to Memphis over the weekends. He also remained active in supervising the operation of the lands by tenants and lessees with whom he continued to advise until his death.

Numerous witnesses on both sides attested to the fact that testator was eccentric, nervous, sentimental, emotional, restless, extremely talkative and dominating in conversation. Several witnesses, some of whom were tenants or servants on testator's plantation, testified that he carried a pistol, would call the negro laborers on his farm together at any time of the day or night and lecture, pray and preach to them; that he would become so excited in conversation that he would stomp his hat, curse and sometimes tear off his clothes; that he would jump from one subject to another in conversation; that he would make improper advances to negro women servants on the place; that he would whip the negroes with his hat, and tell them that if they wanted to go to Heaven, they would have to get an order from him. He was also described as a man who enjoyed putting on a show, and could "put on a Thespian act that would excel the Barrymores." He would break down and cry like a child and say his daughter did not love him.

Despite these peculiarities, most of the tenants and servants were not afraid of him and remained loyal and devoted to him. Some of the lay witnesses testified that in their opinion testator was insane or not "at himself" when he made the will, while others hesitated to go this far and refused to say that he was insane at any time. Others thought that he was mentally unsound at times. There was evidence that the over-dramatic demonstrations of the testator were not without purpose; that he insisted on his hands working and would call them together when something would go wrong on the plantation. Some witnesses considered testator's way of handling labor as being very effective.

Numerous witnesses on behalf of appellees who were longtime friends or business associates of the testator described him as being a rugged individualist, above the average in intelligence, a keen business man, a good trader, a man of a very high order of mentality, most alert, a born leader, and a very ambitious and determined man.

Dr. R. B. Flaniken, who was the testator's family physician and treated him in his last illness, described the testator as being much above the average in intelligence and stated that his mind was normal and sound when the will was executed. Appellant discharged Dr. Flaniken as her mother's physician after she learned that he did not support her theory as to the testator's mental condition. Dr. Flaniken had also formerly been appellant's family physician. Dr. Roy Carruth, who assisted in the treatment of the testator in 1912 and thereafter saw him several times each year, concurred in the opinion expressed by Dr. Flaniken. Numerous businessmen, associates, and acquaintances of the testator testified that the testator in their opinion was sane at the time of the execution of the will.

Two psychiatrists who had never known or treated the testator testified on behalf of appellant. In answer to an eight-page hypothetical question they gave an opinion that testator was of unsound mind when he

executed the will. Among the numerous assumptions included in the question were those that the testator had a sense of grandeur, that he was constantly under stress of a fear that someone was going to do him great personal injury; that he once had shot and killed a man at the back end of his store who testator claimed was trying to break in and there was no evidence of such breaking in; that during the latter years of his life he lacked memory for events of recent happenings; that he mistakenly contended from appellant's first marriage that she did not love him; and that he tried to and succeeded in breaking up appellant's first three marriages. It would unduly prolong this opinion to discuss the evidence bearing on these and many other assumptions contained in the hypothetical question. It is sufficient to say that the preponderance of the evidence does not support these and some of the other factual assumptions upon which the opinions were based. One of the psychiatrists admitted that a good medical doctor who really knew the testator would be in a better position to give an opinion as to his sanity than one who takes a hypothetical question and bases an opinion solely thereon.

There was some evidence that testator at one time had syphilis which sometimes leads to paresis. Blood tests made in October, 1945, were positive and those made a few months later were doubtful or negative. A test made upon testator's admittance to a hospital on March 1, 1948, for treatment of a gall bladder ailment was negative as to syphilis. The psychiatrists would not state positively that testator had paresis. Testator's family physician saw no evidence of paresis and doubted that testator had ever been afflicted with syphilis.

The will in question was prepared by attorneys, G. B. Seagraves of Osceola, Arkansas, and J. C. Kincannon of Memphis, Tennessee. The home of Mr. Kincannon is adjacent to that of the testator and they and their families had been friends for many years. Mr. Seagraves represented the Lowden Trust in Mississippi County and was also retained as attorney by F. G. Barton Cotton Co. on a small annual fee basis. In the latter

part of 1947, Mr. Seagraves was handling a legal matter pertaining to a real estate transaction for the testator when the latter stated that he was going to make a new will and was getting what information he could about a trust estate. About the same time testator made inquiry of Mr. Kincannon as to the ability of Mr. Seagraves as a lawyer and stated that since most of his land was in Arkansas, he wanted to employ an Arkansas attorney to draft the will with Mr. Kincannon's assistance.

At three conferences held in Memphis during the month of January, 1948, testator explained to his attorneys in detail how he wanted to dispose of his property. He told them that his daughter had been married four times; that she did not have any children and could have none; that he did not consider her competent to take title to the property; and that he was especially concerned that his wife and daughter be taken care of during their lives, but did not want his estate dissipated. He also predicted that appellant would contest his will, but steadfastly refused to follow counsel's suggestion that a forfeiture clause be inserted cutting her off in the event she did attempt to break the will.

Mr. Seagraves drew preliminary drafts of the trust provisions of the will which were discussed at the last two conferences and Mr. Kincannon was directed to work on the final vesting provisions. The final draft of the will as executed was prepared in Mr. Kincannon's office at the third conference. Appellee Barton attended this conference at the insistence of the testator and was also present part of the time during the first two conferences. Before final execution of the will it was taken to the Carruth home by Mr. Kincannon and was read and discussed in detail with Mr. and Mrs. Carruth and approved by her. At testator's suggestion the will was executed at the National Bank of Commerce and witnessed by two officials of the bank. The original was placed in a lockbox of the F. G. Barton Cotton Co. where the testator kept other valuable papers.

After execution of the will testator discussed its provisions with many persons including Dr. Thomas R.

Hamilton and A. P. Carruth and explained to them his reasons for the various provisions in the will. Appellee Barton told appellant about the provisions of the will, after it was executed, at a meeting in which he was trying to effect a reconciliation between appellant and her father. The evidence is conflicting as to whether appellee Barton suggested the employment of Mr. Seagraves.

The effect of the testimony of the attorneys who represented the testator is that the will was drawn as he specifically directed and that every provision was in accordance with his very decided and determined wishes and directions. They, as well as the attesting witnesses, were also of the positive opinion that he was of sound mind and disposing memory at the time the will was executed. There is no evidence that Mr. Kincannon had any connection with the appellee, Frank G. Barton, and appellant conceded that he was a man of high integrity.

The trial court made the following findings which were made a part of the judgment: ''In this case the burden was on the contestant to show that at the time the will was executed the testator lacked the required mental capacity to execute the same. Our Supreme Court has defined the mental capacity to execute a will as: '1. The ability of the testator to retain in his memory, without prompting, the extent and condition of his property; 2. To comprehend to whom he is giving it; and 3. To realize the deserts and relations to him of those whom he excludes from his will.'

''The contestant in this case has shown that L. H. Carruth was an eccentric, but a man's mental capacity must be gauged by something more than his idiosyncrasies and peculiarities. The evidence shows that Mr. Carruth was an able business man and most certainly knew the extent and condition of his property. It is the opinion of this Court that the contestant has failed to discharge the burden resting upon her to establish that L. H. Carruth did not, on the 3rd day of February, 1948, have sufficient mental capacity to execute his will.

"On the question of undue influence such as invalidates a will, our Supreme Court stated in *McCulloch* v. *Campbell,* 49 Ark. 367, 5 S. W. 590, 'The influence which the law condemns is not the legitimate influence which springs from natural affection, but the malign influence which results from fear, coercion or any other cause that deprives the testator of his free agency in the disposition of his property.'

"The testimony shows a very close business relationship existed between L. H. Carruth and Frank Barton. It shows that Mr. Carruth had a very high regard for Mr. Barton's business ability. The testimony shows further that Mr. Carruth was a man of independent thought and action. The will was prepared by two reputable and competent attorneys. After receiving instructions from Mr. Carruth about the provisions of the will, the attorneys spent considerable time working on the instrument and it was nearly a month after the first conference until the execution of the will. In view of these things this Court cannot find that Mr. Carruth's will was executed through fear, coercion or any other malign influence."

The preponderance of the evidence supports the trial court's findings.

While appellant concedes that this court is committed to the general rule that the burden of proof rested upon her to show lack of mental capacity and undue influence, it is argued that this burden shifted to appellees as it was shown that Frank G. Barton was present and assisted in the writing of the will in which he was named as residuary legatee and that a confidential relationship existed between him and the testator. It is well settled by our decisions that the burden of proving the insanity of a testator, or that his will was procured by undue influence, is upon those who contest a will. *Smith* v. *Boswell,* 93 Ark. 66, 124 S. W. 264; *Blake* v. *Simpson,* 214 Ark. 263, 215 S. W. 2d 287. The mere fact that a legatee is present when the will is executed without any evidence that he induced or procured the execution of the will does not raise any presumption of undue in-

fluence. Page on Wills (Lifetime Edition) Vol. 2, § 836. It is also the rule in most jurisdictions that a presumption of undue influence is not raised, and the burden of proof is not shifted, by the mere fact that a beneficiary occupies a confidential or fiduciary relation as regards the testator. 68 C. J., Wills, § 451. There is no direct evidence that Frank G. Barton exercised any undue influence over the testator nor do the facts and circumstances in evidence warrant the conclusion that he insidiously or secretly moulded the mind of the testator to suit his purposes. Moreover, Barton's business relation with the testator was that of cotton broker and lending agency which would not ordinarily be considered confidential or fiduciary.

It is also argued that the testator made an unnatural disposition of his property in violation of appellant's rights as his sole heir at law, which resulted from an insane delusion that testator's daughter did not love him. We cannot agree with the proposition that it is unreasonable and unnatural for a husband and father to leave a large estate in trust for the benefit of his wife and daughter during their lives under the circumstances presented in this case. The net income of the trust estate for distribution to appellant and her mother for 1949 amounted to approximately $24,000 and the *corpus* of the estate may be encroached upon if necessary to meet their needs. Nor can we agree with the further contention that the evidence fails to disclose any basis for a belief by the testator that his daughter did not in fact love him. The delusion which operates to defeat a will is defined as follows in *Taylor* v. *McClintock,* 87 Ark. 243, 112 S. W. 405: "Where one conceives something extravagant, and believes it as a fact, when in reality it has no existence, but is purely a product of the imagination, and where such belief is so persistent and permanent that the one who entertains it cannot be convinced by any evidence or argument to the contrary, such a one is possessed of an insane delusion." It was also said in that case that the mere existence of a delusion is not sufficient to invalidate a will and that its connection with

the will must be made manifest and shown to have influenced its provisions. The court further said: "A belief grounded on evidence, however slight, necessarily involves the exercise of the mental faculties of perception and reason; and where this is the case, no matter how imperfect the reasoning process may be, or how erroneous the conclusion reached, it is not an insane delusion."

Although appellant testified that her love and affection for her father had never been disrupted, she admitted that she was estranged from both parents for a period of 3½ years. She attributed this estrangement to a message sent her by her father, but the contents of such message were not revealed. Appellant was also estranged from her father during the last year of his life. Shortly after Mrs. Carruth suffered a stroke in July, 1948, appellant and her father had a quarrel which ended in a physical encounter and she thereafter refused to visit her father until shortly before his death. There was no gift for her father among those she sent to his household at Christmastime in 1948. Other incidents could be related which, with those named, amount to some evidence that testator's statements as to his daughter's affection toward him were not wholly false and imaginary. The evidence as a whole does not warrant the conclusion that the provisions of the will were prompted by an insane delusion.

The judgment is affirmed.