Doris OLIVER *v.* Juanita GRIFFE

CA 82-369                                    649 S.W.2d 192

Court of Appeals of Arkansas
Opinion delivered April 20, 1983

*Smith & Nixon,* by: *Griffin Smith,* for appellant.

*Wayne R. Foster,* for appellee.

GEORGE K. CRACRAFT, Judge. Doris Oliver appeals from an order of the Probate Court of Pulaski County denying probate of a will proffered by her. Doris Oliver and Juanita Griffe are the two daughters of John E. McKinney who died in Pulaski County on January 9, 1981. On February 26, 1981 an instrument purporting to be the last will of John McKinney executed June 2, 1976 was admitted to probate on an ex parte application of Juanita Griffe. In this will he left everything to Juanita, except for the sum of $1.00 which was bequeathed to Doris. On March 3, 1981 Doris Oliver filed a petition asking that the prior order be vacated and that a document purporting to be the will of John McKinney dated June 20, 1980 be probated as his last will and testament. Juanita opposed probate of the second will alleging that it was executed at a time when the testator lacked testamentary capacity and that it was procured by fraud and undue influence. The chancellor found that at the time the 1980 will was executed the testator lacked the requisite capacity and that as drafter-procurer of the will Doris Oliver had failed to meet her burden of proving beyond a reasonable doubt that the testator had both the mental capacity and freedom of will to execute a valid will. Appellant contends that it was error under the circumstances of this case for the trial court to place upon her the heavier burden of proof.

No one disputed the controlling principles of law. Ordinarily the party challenging the validity of a will is

required to prove by a preponderance of the evidence that the testator lacked the mental capacity or was unduly influenced at the time the will was executed. *Sullivant* v. *Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963); *Greenwood, Guardian v. Wilson, Adm'x,* 267 Ark. 68, 588 S.W.2d 701 (1979); *Orr* v. *Love,* 225 Ark. 505, 283 S.W.2d 667 (1955). Where, however, a beneficiary under the will either drafts or procures the making of it there is a rebuttable presumption of undue influence and it is incumbent on the proponent of that will to show beyond a reasonable doubt that the testator had both the mental capacity and such freedom of will and actions as are requisite to render a will valid. *McDaniel, Adm'r* v. *Crosby,* 19 Ark. 533 (1858); *Orr* v. *Love, supra; Short* v. *Stephenson,* 238 Ark. 1048, 386 S.W.2d 501 (1965); *Smith* v. *Welch,* 268 Ark. 510, 597 S.W.2d 593 (1980). The questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considers them together, for in one case where the mind of the testator is strong and alert the facts constituting undue influence would be required to be felt stronger than in another case where the mind of the testator was impaired either by some inherent defect or by the consequences of disease or advancing age. *Short* v. *Stephenson, supra.*

The appellant contends only that the rebuttable presumption of invalidity does not arise as to a drafter or procurer of a will who receives no more benefit under it than he would have received had the testator died intestate. In this case appellant contends that in drafting the will she received no unconscionable benefit at the expense of her sister or the other beneficiary. However, this argument overlooks the fact that the 1976 will disinherited the appellant and only if the 1980 will that she procured were sustained could she receive more than the sum of $1.00. Under the circumstances of this case we cannot conclude that the probate court misapplied these rules.

The appellee testified that the relationship between the appellant and her father was not good and that his reasons for disinheriting her in the 1976 will resulted from appellant's conduct with respect to the sale of a home in which her

father and mother had resided prior to the mother's death. Soon after the death of the testator's wife in 1971 he executed deeds conveying the property to the two daughters and reserving a life estate in himself. By 1976 the father's health had deteriorated to such an extent that he was unable to maintain his home any longer and therefore wanted to sell it. According to the appellee, appellant did not want to sell the house and refused to join in any conveyance although her father even offered to sell it to her on a first choice basis. Appellant took some furniture from the house and this angered her father. Later appellant finally agreed to sell providing a certificate of deposit was purchased in all three names with the proceeds. Such a certificate was purchased after the sale in July 1976, but on the day that appellee's father executed the will leaving everything to her he instructed her to take appellant's name off the certificate. Upon discovering that this had been done, appellant brought an action to compel the restoration of the certificate of deposit in accordance with their agreement and obtained a court order to that effect. According to the appellee their father's resentment toward appellant increased because of her conduct concerning the property he considered his homestead and he never expressed to her any intention to change his 1976 will.

The appellant offered testimony in direct conflict with that offered by appellee. Appellant admitted writing the will and taking it to her father for execution at the nursing home. Her testimony as to the events leading up to the drafting was conflicting. She first testified that she had asked her father if he had a will and when he said he did not she asked him if he wanted one. He said that he did want one and desired that everything be divided equally between his two daughters. In a pre-trial deposition she had not stated that she had received any instructions from her father and when cross-examined about it at the trial she stated that when her father told her he did not have a will "the way things had gone down I figured one was needed because everyone needs a will." She explained that she was referring to the time when they had sold the house when she did not want to sell it and they had insisted upon it. She stated that she had finally agreed by telling her sister and her father that she would sell it if the

money was put in a certificate of deposit with all three names on it. That was done. Shortly after that her sister took the certificate of deposit out and "took my name off it and left hers and my dad's on it. And I figured then that I needed a will for everything that was left."

In any event after the will was drafted the appellant asked one relative and a best friend to go with her to the hospital to witness the will. Both of the witnesses testified that the testator appeared to be lucid and although the will was not read to him he read it himself before signing it. Both testified that after he had read it the testator indicated that the will was as he wished it. Appellant testified that she was unaware that her father had suffered a stroke or that he was having any mental problems.

Dr. James D. Wilson, the testator's personal physician from 1977 to the date of his death, testified that the testator had suffered a stroke in November of 1979 for which he was hospitalized in St. Vincent Infirmary. On November 20, 1979 he was transferred to the Arkansas Nursing Home where he remained until his death in January of 1981. He was seventy-four years old and after his stroke he was found to be unresponsive and showing chronic brain syndrome, a condition where the patient gradually loses mental faculties and physical abilities. It is not a process of aging but is a specific disease which is irreversible. It is characterized by loss of memory of recent events. On some days the testator's degree of confusion would be worse than on others. The patient was suffering from severe arthritis and it was the opinion of the doctor that because of this he could not have signed an instrument without someone controlling his hand on June 20, 1980. It was his further opinion that at no time after the stroke on November 17, 1979 did he possess the ability to retain any memory without prompting as to the extent and conditions of the property he disposed of or his ability to comprehend the contents of a will or the relationship of those he had excluded or included.

The nurses' records noted disorientation on the testator's part on many occasions during the two weeks preceding June 20th. It was shown that on the day before he

had been noted as "disoriented." There was other lay testimony that he was confused, did not recognize people, including his own kin, and often suffered hallucinations.

Without reciting in detail all of the testimony we conclude from our reading of it that the probate judge did not err in finding that the appellant was the drafter and procurer of the will in question and that she benefited by it. For these reasons we cannot say the probate judge erred in imposing upon her the burden of proving beyond a reasonable doubt that the testator possessed the requisite mental capacity and freedom of will to execute the instrument. Nor can we say that his finding that the appellant failed to discharge that burden is not supported by the record.

We affirm.