Lewis O. GREEN, Guardian of the Person and Estate
of Erda N. GREEN, an Incompetent *v.* Cliff
HOLLAND et al

CA 82-475                                   657 S.W.2d 572

Court of Appeals of Arkanss
Division II
Opinion delivered October 5, 1983

*Thomas, House & Gardner,* by: *Hoyt Thomas,* for appellant.

*Southern & James,* by: *Dennis L. James,* for appellees.

GEORGE K. CRACRAFT, Judge. Lewis O. Green appeals from an order of the probate court declaring that a will executed by Erda Green on October 30, 1978 is a valid one. The testatrix was seventy-eight years old at the time the will was executed. The will provided for a bequest of $10.00 to appellant Lewis O. Green, her third husband, and named her nephew, Cliff Holland, as sole beneficiary of the residue of her estate. The appellant contends that the trial court erred in holding that he had failed in his burden of proving that the will was invalid because of mental incapacity and undue influence, and in finding that the will had been executed in the manner provided by law. We do not agree.

Appellant's first contention is based on the charge of undue influence and mental incapacity of the testatrix. Generally, mental or testamentary capacity means that the testatrix must be able to retain in her mind, without prompting, the extent and condition of her property, to comprehend to whom she is giving it, the relation of those entitled to her bounty and the deserts of those whom she

excludes from her will. *Hiler* v. *Cude, Ex'r*, 248 Ark. 1065, 455 S.W.2d 891 (1970). A testatrix's old age, physical incapacity and partial eclipse of the mind will not invalidate a will if she had sufficient capacity to remember the extent and condition of the property and who her beneficiaries are. *Griffin* v. *Union Trust Co.*, 166 Ark. 347, 266 S.W. 289 (1924). Complete sanity in a medical sense at all times is not essential to testamentary capacity provided that capacity exists at the time the will is executed, during a lucid interval. The test is whether the testatrix at the time the will was executed had a fair comprehension of the nature and extent of her property and to whom she was giving it. *Scott* v. *Dodson, Executor*, 214 Ark. 1, 214 S.W.2d 357 (1948).

The testimony in this voluminous record is conflicting. A number of witnesses, some of them kinsmen, testified that they were intimately acquainted with the testatrix and had noted a mental deterioration beginning as early as 1974 or 1975. Some of them testified that when the will was executed in 1978 she was mentally incompetent and did not have the requisite ability to retain without prompting the extent of her property and to whom she was giving it. On the other hand, there were a number of witnesses with equally long acquaintance and kinship who testified that the testatrix's mental deterioration did not occur until at least a year after the will was executed and at the time the will was executed she was fully competent. Dr. Poff, who had been her doctor since 1971, testified that in 1977 she was in the hospital but his records showed no indication of incompetency although she was given medication for arteriosclerotic cardiovascular disease. He further testified that in August of 1979, almost a year after the will was executed, he again treated her and felt at that time that she was mentally incompetent but "I cannot pinpoint a definite date when I would consider that she became incompetent." She was thereafter placed in a nursing home and a guardian of her person and estate was appointed.

A number of appellant's witnesses stated that she had "good days and bad days" and that sometimes they felt her to be competent and at others incompetent. Some of those witnesses testifying positively to her competency or to her

"lucid intervals" were those who were in a position to take an interest in the estate by the law of descent and distribution in the event the will be declared invalid.

The attorney who drafted the will testified that he first interviewed the testatrix alone in his office. He stated that it was his custom in dealing with elderly people to go over the matter with them completely to make certain that they knew what they wanted to do. He found nothing in that interview or at the time the will was executed that gave him any indication of incompetency. His secretary and the two other persons present in the office at that time concurred with his observation. There was no evidence to the contrary. The probate judge could easily have concluded that despite any existing mental impairment, the will was executed at a time when she was experiencing a lucid interval.

Ordinarily the party challenging the validity of a will is required to prove by a preponderance of the evidence that the testator lacked the mental capacity or was unduly influenced at the time the will was executed. The questions of testamentary capacity and undue influence are so interwoven in any case where these questions are raised that the court necessarily considers them together. *Oliver* v. *Griffe*, 8 Ark. App. 152, 649 S.W.2d 192 (1983); *Sullivant* v. *Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963).

Appellant argues that he was aided in the discharge of his burden of proof by the fact that the testatrix was seventy-eight years old and had excluded a "living spouse and numerous blood relatives" at a time when it was shown that she was experiencing vascular changes which ultimately resulted in her incompetency."

There was evidence that Lewis Green was her third husband and that their relationship was not good. There was testimony from several witnesses tending to establish other reasons why he might be excluded. The testatrix's estate consisted primarily of real estate which had been in her family for many years. She had no children, but Lewis Green had four by a prior marriage. There was testimony

that clearly manifested her intent that the ownership of this property remain in her blood line.

Nor is her preference of Cliff Holland over other relatives indicative of undue influence under the circumstances of this case. That undue influence which avoids a will is not the influence which springs from natural affection or kind offices but is such as results from fear, coercion or any other cause which deprives the testatrix of her free agency is disposing of her property and it must be directly connected with the execution of the will and specially directed toward the objective of procuring it in favor of particular parties. *Sullivant* v. *Sullivant, supra.*

Here there was no evidence that Cliff Holland exercised any influence over the testatrix to execute a will in his favor. To the contrary, the facts and circumstances indicate that she was influenced solely by a motherly affection toward him. The testimony shows that, although she had other kinsmen including nieces and nephews, her relationship with Cliff Holland was much closer than that with the others. Cliff Holland and his deceased brother, Jack, were the children of one of her sisters. Their father was the brother of the testatrix's second husband. For this reason they were referred to as "double nephews." After the death of their father Cliff Holland and his brother Jack had lived in the home with the testatrix and her second husband, Joe Holland, and had been raised by them as their own children. They both resided there until they left to enter military service and both returned after their discharge. Cliff Holland lived on the land until after the death of Joe Holland. In 1952 Cliff and his wife, Rachel, moved to California and the testatrix accompanied them there. While in California she married Lewis Green. In 1972 Cliff Holland and his wife and children returned to Cleburne County and continued to reside on the property. Erda and Lewis Green had also returned at that time and resided on Erda's property.

There was an abundance of testimony that the testatrix had for many years declared that at her death all of the property would belong to Cliff Holland and his brother Jack. After Jack's death she had executed a will leaving

everything to Cliff Holland. A number of witnesses testified that the testatrix had exhibited that will to them and that they had read it. Others who had not read the will testified to having heard her mention it and still others testified that they had heard Erda say that at her death the property would belong to Cliff. There was direct evidence that the only reason the testatrix desired to execute a new will was because she had been told by Lewis Green that a will more than ten years old was not effective and that she wished to "renew it."

Appellant also argues that the trial court should have shifted the burden of proof to appellee and required him to prove freedom from undue influence and mental capacity beyond a reasonable doubt because he was the procurer of the will. This argument is based upon the fact that the drafting attorney had previously represented Holland in other matters, Holland had made the appointment for the testatrix to see that attorney, and Holland's wife had driven the testatrix to the attorney's office and was present in the office at the time the execution took place.

It is true that if a beneficiary under the will either drafts or procures the making of it, there is a rebuttable presumption of undue influence and it becomes encumbent on the proponent of that will to show beyond a reasonable doubt that the testator had the required mental capacity and freedom of will. *Orr* v. *Love,* 225 Ark. 505, 283 S.W.2d 667 (1955); *Oliver* v. *Griffe, supra.*

However, the mere fact that a beneficiary or a beneficiary's spouse is present while the will is made does not give rise to any presumption of undue influence where there is no evidence he or she induced or procured the execution of the will. *Abel* v. *Dickinson,* 250 Ark. 648, 467 S.W.2d 154 (1971); *Jones* v. *National Bank of Commerce,* 220 Ark. 665, 249 S.W.2d 105 (1952). Appellee testified that the reason he made the appointment for the testatrix was because she did not know any lawyers in the area and asked him to do so. He stated that she did not discuss the will with him and that he made no suggestions to her. His wife Rachel testified that she did not discuss the matter with the testatrix at any time and that she waited in the lobby of the lawyers' office while

the transaction took place. She denied being in the inner office when any of the conversations between the testatrix and the attorney took place or when the will was executed.

Probate cases are tried *de novo* on appeal but will not be reversed unless clearly against a preponderance of the evidence. Since the question of preponderance of the evidence turns largely on the credibility of the witnesses we defer to the superior position of the trial court. ARCP Rule 52 (a); *Andres* v. *Andres,* 1 Ark. App. 75, 613 S.W.2d 404 (1981).

When all of the conflicting evidence is considered and after giving due deference to the superior position of the probate judge to determine the credibility of the witnesses and the weight to be given their testimony we cannot say that his findings were clearly erroneous. The evidence appears abundantly sufficient to sustain them.

The appellant next contends that the trial court erred in holding the proffered will to be valid because the testimony does not establish that it was executed in the manner required by Ark. Stat. Ann. § 60-403 (Repl. 1971) which provides, among other things, " . . . [T]he testator shall declare to the attesting witnesses that the instrument is his will and either sign it or acknowledge a signature already made . . . the attesting witness must sign at the request and in the presence of the testator." We do not agree.

Dave Harrod, the drafting attorney, Susan Logan, his secretary, and Bryce Marler, a client of Harrod's who happened to be in the outer office at the time, signed the attestation clause of the will in which they certified that all statutory requirements had been complied with. This trial was held four years later. Appellant's argument is based upon statements of the attesting witnesses that they could not specifically recall all of the details of the occurrence.

The attorney testified that the testatrix made an appointment and came to his office for the purpose of drafting a will. After discussing with him the appropriate contents of her will, she waited in his office while his secretary typed it.

He stated that she signed it and that he requested Susan Logan and Bryce Marler to serve as witnesses. The secretary testified that she recalled preparing the will and acknowledged her signature on the attestation clause. When asked on cross-examination if she saw Mrs. Green sign the will she said she could not positively recall but that the general procedure in their office was that each will was witnessed in the presence of the person executing it. Marler stated that, although he could not testify to a positive recollection of seeing Erda execute the will, he had witnessed many wills and never did so unless he had seen the person sign the document and request him to be a witness. He did recall going into the inner office to witness the will and "meeting the lady who said that she had signed the will." Neither witness could positively recall the testatrix specifically requesting that they witness the will.

In one of our earliest cases our court rejected the requirement of strict compliance with these statutory requirements. It was held that although the testatrix shall declare it, no particular words or mode of communication was necessary. The fact of publication can be inferred from all of the circumstances attending the execution of the will. *Rogers* v. *Diamond,* 13 Ark. 474 (1852). A testator may acknowledge his signature by acts and gestures without expressing it in words. *Hanel* v. *Springle, Admr.,* 237 Ark. 356, 372 S.W.2d 822 (1963); *Anthony* v. *College of the Ozarks,* 207 Ark. 212, 180 S.W.2d 321 (1944).

Although no presumption of due execution of a will arises from the mere production of an instrument purporting to be a will, if it appears to have been duly executed and the attestation is established by the witnesses to its execution, although they do not remember the transaction, it will be presumed, in the absence of evidence to the contrary, that the will was executed in compliance with the requirements of law including those as to attestation in the presence of the testator and affixing the testator's signature prior to those of the witnesses. *Anthony* v. *College of the Ozarks, supra; Walpole* v. *Lewis,* 254 Ark. 89, 492 S.W.2d 410 (1973). The requirements for establishing an attested will must be read together and construed to permit establishment of the will

by any legally admissible evidence or requisite facts in order that the testatrix's wishes may not be thwarted by straight-laced construction of statutory language where there is no indication of fraud, deception, imposition or undue influence. *Walpole* v. *Lewis, supra.*

The trial court found that the testatrix had the requisite testamentary capacity and was acting without undue influence. She went to the attorney's office for the specific purpose of making a will and did so. No one questioned the genuineness of her signature. When all the facts and circumstances surrounding its execution are considered in light of the principles we have recited, we cannot say that the probate judge's determination that the will was validly executed was clearly erroneous.

Affirmed.

CLONINGER and GLAZE, JJ., agree.