Robert T. FISCHER and Linda Howeth  *v.*
Robert T. KINZALOW and Ouida Smith, Co-administrators
of the Estate of Ouida B. Lawhorn, Deceased

CA 03-1134                                                 198 S.W.3d 555

Court of Appeals of Arkansas
Opinion delivered November 17, 2004

*Durrett and Coleman*, by: *Gerald A. Coleman*, for appellants.

*Bart Ziegenhorn*, for appellees.

JOHN B. ROBBINS, Judge. This appeal concerns a will contest involving the estate of Ms. Ouida Lawhorn. Appellants Robert Fischer and Linda Howeth are former stepchildren[1] of the decedent, Ouida Lawhorn, and were the sole beneficiaries of a will Ms. Lawhorn executed on July 29, 1994. Appellee Robert Kinzalow, Ms. Lawhorn's male companion for the eleven years preceding her death, was the sole beneficiary of a handwritten will she signed in the hospital during Thursday afternoon, March 28, 2002. Ms. Lawhorn had no children and no spouse at the time of her death from cancer at age 69. She died on March 30, 2002. Appellants appeal the order of the Crittenden County Circuit Court that admitted Ms. Lawhorn's March 28, 2002, will to probate and dismissed appellants' objection to probate.

In challenging the 2002 will, appellants argued to the trial court (1) that the testatrix was not competent at the time of its execution, (2) that the testatrix was subject to duress and over-reaching, and (3) that the will was not properly executed. Appellants did not prevail at trial, and on appeal, they argue that Ms. Lawhorn was not competent at the time of the execution of the 2002 will and that the handwritten will was not properly executed pursuant to Arkansas law. We disagree with their arguments and affirm.

---

[1] Appellants are not blood related to the decedent or to each other. Ms. Lawhorn was married a number of times during her life.

The evidence presented to the trial judge included that of appellant Howeth. She said that she was very close to her former step-mother and that Ms. Lawhorn had given her a power of attorney at the same time that her 1994 will was executed. In addition, Howeth said that she was also given authority to write checks from Lawhorn's account in 1994. The only time Howeth ever wrote checks on the account, though, was to pay some of Lawhorn's bills after Lawhorn's surgery in January 2002.

Howeth came to see Lawhorn on Thursday, March 28, driving from Texas and arriving at the hospital around 5:00 or 6:00 p.m. Howeth did not think that Lawhorn was of sound mind at that point. Howeth did not remember Lawhorn saying much to her except that she was glad Howeth was there. Howeth left the hospital for part of Friday, March 29 and returned on Saturday. Howeth believed that she was the only person in the room with Lawhorn when she died Saturday morning. Howeth said that she, appellant Fischer, and appellee Kinzalow all contributed to the cost of Lawhorn's funeral. In looking over the 2002 will and a check purportedly written by Lawhorn on that same date, Howeth said that the signatures did not look like Lawhorn's but instead looked "forced."

Appellant Fischer testified that he arrived at the hospital on March 28 at around 8:30 a.m. and that Ms. Lawhorn asked her doctors to provide him with complete information about her medical condition. The doctor took Fischer out into the hallway and explained that Ms. Lawhorn had terminal pancreatic cancer. Fischer said that Ms. Lawhorn was cognizant of her surroundings, her impending death, her family, her estate, the existence and location of the 1994 will, the need to plan a funeral, and her desire that Mr. Kinzalow be taken care of after her death. Fischer said Lawhorn told him that the 1994 will split everything evenly between him and Howeth. Fischer said that Lawhorn wanted Kinzalow to be allowed to continue to live at her residence for the rest of his life if he wanted. Fischer intended to honor that request. Fischer believed that she was cognizant until noon or early afternoon, when she became very groggy due to the Demerol used to ease her pain.

Lorrine Long, Brenda Hodgson, and Robert Martin also came to the hospital to visit that day. Hodgson, formerly a niece by marriage to Ms. Lawhorn, explained that she and Mr. Martin lived together and rented a cottage for occasional use from Ms. Lawhorn; they were friends with Ms. Long. They all arrived after

the noon hour and were present until mid-afternoon. Their testimonies were uniform in that they agreed that Ms. Lawhorn was cognizant, alert, and conversational during the visit. They also agreed that the other visitors left the room, including Mr. Kinzalow, during the time that the handwritten will was requested, written, read, and signed.

Hodgson testified that Ms. Lawhorn asked her if she had a piece of paper and if she would write something for her. Hodgson found a dental form in her purse and used the back of it. Ms. Lawhorn told her that she wanted Kinzalow to be taken care of and for him to have everything. Hodgson testified that she wrote out a will according to Ms. Lawhorn's wishes, that she read the will back to Ms. Lawhorn, and that she acknowledged that it contained her wishes. The document read:

> March 28, 2002
> Baptist East Hospital
>
> I Ouida B. Lawhorn being of sound mind & memory do at this time declare this is my last will & testament. From this day on all other wills to be null, void, & revoked. Being a resident of Horseshoe Lake Arkansas give & bequeath all of my estate Real and Personal to Robert Kinzalow now & forever.
>
> Signed & Witnessed on this 28th Day March 2002
> Brenda L. Hodgson [signature]
> Robert Martin [signature]      Ouida Lawhorn [signature]
>                               Ouida Lawhorn

Hodgson said she knew how to prepare a will because of her experiences when her mother died about three years before. Hodgson watched Ms. Lawhorn sign the will as she lay in bed using the roll-away hospital table. Thereafter, Hodgson and Martin signed as witnesses, all done in presence of one another. Hodgson said she folded the paper and put it in her purse, and she told no one else about it until after she had consulted an attorney to determine if it was valid. Hodgson was certain that Ms. Lawhorn was of sound mind at the time.

Robert Martin testified that he could not hear all of the conversation between Hodgson and Ms. Lawhorn, but he heard enough to understand that a will was being drafted at Ms. Lawhorn's request, that it was intended to be her last will and

testament, and that he and Hodgson were to be the attesting witnesses. Martin watched Ms. Lawhorn sign it, watched Hodgson sign it, and then he signed it. Martin said Ms. Lawhorn was treating herself that day for pain by pushing a button to receive a dose of medicine. Notwithstanding that fact, Martin believed she understood what she was saying and doing.

Lorrine Long corroborated the testimony of both Hodgson and Martin. Long testified that she was also a weekend renter of Ms. Lawhorn and that when she came to visit that day, Ms. Lawhorn asked about Long's grandchildren by name. Long said Ms. Lawhorn knew what she was doing and did not appear to be confused, even though she had self-induced intravenous Demerol. As the will was being prepared, Long said she was not near enough to hear everything that was said because she was across the room. However, Long said she had seen and heard Ms. Lawhorn asking for a piece of paper, Hodgson writing down what Ms. Lawhorn wanted, Ms. Lawhorn signing it, and then Hodgson and Martin signing it. The entirety of drafting, reading, and signing the paper took in her estimate twenty to thirty minutes.

Ouida Smith testified that Ms. Lawhorn was her aunt and that she (Smith) was the person who eventually filed the handwritten will with the probate court. Smith said her aunt had called her about a week before she died and mentioned that she had made a mistake on her will, but her aunt did not explain what she meant. Smith came to the hospital on the morning of March 28 and stayed until some time between 4:00 p.m. and 5:00 p.m. Smith was not present when the 2002 will was prepared and signed. Smith stated that her aunt was cognizant that day, that her aunt comforted her upon her departure and told her not to be upset about her illness and imminent death, and that she was talking to other people at the hospital. Smith returned the next day accompanied by her husband, and said that though her aunt was weaker, she still recognized her and her husband. Smith said that Ms. Lawhorn asked about her mother-in-law's health in that conversation, because they were friends. Smith verified that the signature on the 2002 will was Ms. Lawhorn's. She compared her aunt's signature on the will with those written on various checks; she believed that they were all Ms. Lawhorn's signatures.

Mildred Cosby, who is Smith's mother and Lawhorn's sister-in-law, testified that she had visited Lawhorn in the hospital

about a week prior to her death. Cosby testified that when she came into the hospital room, Lawhorn told her right away that she had made a mistake in her will.

Robert Lambie came to see Ms. Lawhorn on March 28 during the late afternoon and evening. Lambie was a friend of both Ms. Lawhorn and Mr. Kinzalow, who were "like parents" to him. Lambie said that Ms. Lawhorn was awake, aware, and talking to the people who visited her that day; she did not appear to be under the influence of heavy narcotics. Lambie said that Ms. Lawhorn asked his wife Diane about an eye injury that Diane had suffered earlier. Lambie observed Ms. Lawhorn sitting on the side of the bed and writing a check for a debt owed to "Tommy," hearing Mr. Kinzalow and Ms. Lawhorn discuss the amount and noting that Ms. Lawhorn was able to compute the amount in her head faster than Kinzalow could do so on paper. Lambie and his wife left that evening at around 6:00 or 7:00 p.m. When Lambie visited Ms. Lawhorn the next day, she was heavily medicated.

Mr. Kinzalow testified that he was at the hospital taking care of Ms. Lawhorn, but he was not present when the will was prepared and signed, nor did he know of its existence until weeks after her death. Kinzalow said that he and Ms. Lawhorn had lived together for eleven years, but that she had been in and out of the hospital for the last three months of her life. Kinzalow said that he would go home and sleep only if someone else would come stay with her. When she was in the hospital, Kinzalow said he would leave her room only if someone else was there.

Kinzalow agreed that Ms. Lawhorn wrote a check on March 28 in order to repay a $2200 loan to Tommy Scarborough and that she was not drugged-up at the time. He verified that her signature was on the 2002 will and was very much like the signature on the check she wrote that same day. Kinzalow believed that the doctor's notes were correct, that Ms. Lawhorn became lethargic and less functional by the afternoon of March 29 when the automatic drip of narcotics began, but that up to that point, he thought she was of sound mind, talkative, and aware. According to the hospital records, Kinzalow was in the room when she died the next morning, March 30, at 8:25, and the family was to be contacted. Kinzalow said he later wrote a check to Howeth for his part of Lawhorn's funeral expenses.

After considering the evidence presented, the trial judge concluded that the 2002 will was properly prepared and executed in substantial compliance with Ark. Code Ann. § 28-25-103

(1987); that there was no proof of duress or overreaching worked against the testatrix; and that there was no proof of incompetence of the testatrix. A timely notice of appeal was filed after the order was entered of record.

■ We review probate matters de novo but will not reverse probate findings of fact unless they are clearly erroneous. *McAdams v. McAdams*, 353 Ark. 494, 109 S.W.3d 649 (2003); *Morton v. Patterson*, 75 Ark. App. 62, 54 S.W.3d 137 (2001). A finding is clearly erroneous when, although there is evidence to support it, we are left on the entire evidence with the firm conviction that a mistake has been committed. *Morton, supra.* We also defer to the superior position of the lower court sitting in a probate matter to weigh the credibility of the witnesses. *McAdams, supra.*

The first point on appeal advanced by appellants is that the trial court clearly erred by finding that Ms. Lawhorn was competent to make and execute the 2002 will. We disagree.

■ The party challenging the validity of a will is required to prove by a preponderance of the evidence that the testator lacked the mental capacity or was unduly influenced at the time the will was executed. *Sullivant v. Sullivant*, 236 Ark. 95, 364 S.W.2d 665 (1963); *Green v. Holland*, 9 Ark. App. 233, 657 S.W.2d 572 (1983); *Oliver v. Griffe*, 8 Ark. App. 152, 649 S.W.2d 192 (1983). Generally, mental or testamentary capacity means that the testatrix must be able to retain in her mind, without prompting, the extent and condition of her property, to comprehend to whom she is giving it, the relation of those entitled to her bounty, and the deserts of those whom she excludes from her will. *Hiler v. Cude, Ex'r*, 248 Ark. 1065, 455 S.W.2d 891 (1970). Complete sanity in a medical sense at all times is not essential to testamentary capacity provided that capacity exists at the time the will is executed, during a lucid interval. Evidence of the testator's mental condition, both before and after execution of the will at issue, is relevant to show his mental condition at the time he executed the will. *See Noland v. Noland*, 330 Ark. 660, 956 S.W.2d 173 (1997). The test is whether the testatrix at the time the will was executed had a fair comprehension of the nature and extent of her property and to whom she was giving it. *Scott v. Dodson, Executor*, 214 Ark. 1, 214 S.W.2d 357 (1948).

■ Appellants urge us to hold that because of the hurried and unusual nature of the drafting of this will, and the fact that its existence was concealed for some time after her death, the circumstances cannot support a finding that Lawhorn was competent at the time she signed the will. Appellee counters that the trial judge was not clearly erroneous to find that Ms. Lawhorn was competent when the will was executed in the early afternoon of March 28, based upon his belief in the testimonies of the witnesses who observed her demeanor that day. We cannot say that the credibility determination made by the trial judge was clearly erroneous. Thus, we affirm this point.

■ Appellants also argue in regard to mental capacity that Hodgson and Martin were indirect beneficiaries of the will such that the burden shifted to appellees to demonstrate beyond a reasonable doubt that she possessed mental capacity and was not unduly influenced. This argument was never presented in the trial, and appellants cite no authority for that proposition on appeal. Nevertheless, we disagree that the drafter and witnesses, who rented from Ms. Lawhorn, were beneficiaries under the will. Therefore, the burden of proof did not shift.

For their second point on appeal, appellants challenge whether the trial court clearly erred by finding substantial compliance with the statute setting out the requirements for proper execution of a will. That statute, Ark. Code Ann. § 28-25-103(a) (1987), provides in relevant part that the execution of a will, other than holographic, must be by the signature of the testator and of at least two witnesses. This statute further requires in subsection (b) that the testatrix declare to the attesting witnesses that the instrument is her will and sign the will. The attesting witnesses must sign at the request and in the presence of the testatrix. *Id.* at subsection (c).

■ Our supreme court has upheld execution of wills that "substantially comply" with this statute in certain circumstances. For instance, the supreme court has used this standard regarding the requirement that the testator declare to the witnesses that this is his will, *Faith v. Singleton*, 286 Ark. 403, 692 S.W.2d 239 (1985); *Green v. Holland*, 9 Ark. App. 233, 657 S.W.2d 572 (1983), and to the requirement that the witnesses must sign at the request of the testator, *Hanel v. Springle, Adm'r*, 237 Ark. 356, 372 S.W.2d 822 (1963). *See also Burns v. Adamson*, 313 Ark. 281, 854 S.W.2d 723 (1993). Appellants concede these points of law, agreeing that the

purpose of the statute is to protect such conveyances against fraud and deception but not impede them by technicalities. *See Hanel v. Springle, supra.* Instead, appellants attempt to distinguish the cases above and demonstrate how, under these facts, there was not substantial compliance. Specifically, appellants assert that the testimony indicated that Ms. Lawhorn never declared to Martin that this was her last will and testament, nor did she specifically ask either witness to sign the will.

■■ It is not required, however, that a testator recite precisely the words "this is my will," although that is obviously the preferred practice. *See Faith v. Singleton, supra; Green v. Holland, supra.* The fact of publication can be inferred from all of the circumstances attending the execution of the will. *Faith v. Singleton, supra; Rogers v. Diamond,* 13 Ark. 474 (1852). The trial judge believed that Martin was standing by as Hodgson read the handwritten document to Ms. Lawhorn, and he further believed the testimony that Martin understood this to be Ms. Lawhorn's last will and testament. We hold that the trial judge did not clearly err in finding substantial compliance with the requirement of declaring one's will to the witnesses.

■ Appellants also challenge the finding that there was substantial compliance with the statutory requirement of the testatrix "requesting" her witnesses to sign. Where there is no indication of fraud, deception, undue influence, or imposition, this court avoids strict technical construction of statutory requirements in order to give effect to the testator's wishes. *In re Altheimer's Estate,* 221 Ark. 941, 256 S.W.2d 719 (1953). We seek to determine the intent of the testator. *Morgan v. Green,* 263 Ark. 125, 562 S.W.2d 612 (1978). While the facts surrounding the execution of Ms. Lawhorn's will are troublesome, and had we been sitting as the trial court we might have held differently, we cannot conclude that the trial judge clearly erred.

Affirmed.

BIRD and ROAF, JJ., agree.